THE STATE OF MONTANA, Plaintiff and Respondent, v. DAN JOHNSON, Defendant and Appellant.

No. 13977.
Argued June 13, 1978.
Decided Nov. 8, 1978.
585 P.2d 1328.

62

Daniel R. Sweeney argued, Butte, for defendant and appellant.

Mike Greely, Atty. Gen., Helena, Mike McCarter argued, Asst. Atty., Gen., Helena, John G. Winston, County Atty., Butte, for plaintiff and respondent.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

Defendant appeals from a jury verdict and conviction of robbery under section 94-5-401, R.C.M.1947, and the increased sentence imposed under the prior conviction statute, section 95-1506, R.C.M.1947, by the Court in Silver Bow County.

On February 10, 1977, at approximately 2:00 p.m. a man wearing an army jacket and a ski mask entered "Mom's Cellar." Two patrons and the bartender Charlene Bull, were present in the bar at the time. The man was carrying a gun. He stated, "This is a robbery. Give me all your money." He then fired a shot which struck near the bartender's foot. During the 20 minute robbery the man cut the telephone wires with a knife and forced the bartender to empty cash registers and the patrons' wallets.

The bartender described the robber to police and after going through mug books, she identified defendant as the man in the ski mask. The same day, February 18, 1977, defendant was picked up on a parole violation charge which concerned an unrelated burglary. On February 19th, police authorities conducted line-ups which included defendant. At the first line-up several men wearing ski masks of the type and color worn by the robber appeared, and the bartender identified defendant. The men then lined up without the ski masks and the bartender again identified defendant. The man then spoke certain words and phrases used in the robbery from behind a screen, and the bartender identified defendant's voice. Later, the bartender identified defendant's knife from a selection shown her by the police. On the basis of the bartender's identification, defendant was charged with the robbery of "Mom's Cellar."

On March 8, 1977, defendant's cousin, William Wendell, was directed to report to the office of the prosecuting attorney. While

there, he wrote and signed a statement implicating defendant in the robbery. Sometimes later, a second statement was written by Wendell at defense counsel's office generally denying that the earlier statement had been given voluntarily.

Shortly before trial, on June 22, 1977, the prosecuting attorney had Wendell arrested ostensibly to prevent him from leaving before he could be subpoenaed. The following day he was served with the subpoena and released.

At trial, the State called three witnesses: the bartender, defendant's cousin, William Wendell, and Deputy Sheriff Harrington, the police officer who had been involved in the procedures identifying defendant as the robber.

The bartender gave an account of the events of February 10, 1977, the day of the robbery, and of her subsequent identification of defendant during the line-ups. She explained how the robber had fired a shot and held a knife on her as she freed the jammed mechanism of his pistol. She related what he had said and how he had picked up the money. The most damaging testimony was her identification of defendant as the robber. It was unequivocal. She stated although the robber wore a ski mask she was close enough and observant enough during the 20 to 25 minute robbery to positively recognize the robber.

William Wendell testified about the written statement given on March 8, 1977. From the beginning of his testimony he resisted substantiating the statement. Finally, after reading the statement to himself, he grudgingly related its contents, which tended to implicate defendant. Under cross-examination by defense counsel Wendell repeated his claim that the statement had been coerced and described the events of the day of the robbery so as to exculpate defendant. The State then moved that Wendell be declared a hostile witness. The motion was granted, and the prosecutor embarked on a vigorous cross-examination with the apparent objective of clarifying Wendell's story.

Finally, the State put on Deputy Sheriff Harrington who testified on the line-up procedures used in identifying the defendant as the

robber. He testified that in the knife line-up, no other "buck" knives were displayed because none were available. Harrington also testified that although other officers had access to the bin, the knife was kept in evidence storage at all times.

Defendant raises a multitude of issues on appeal, challenging both his conviction and the legality of his sentence.

Since most of his contentions can be summarily disposed of, we do not list them but deal with them sequentially. First, defendant contends the State's case depended solely on the bartender's testimony arguing it was "doubtful, vague, and uncertain." Defense counsel however, elicited no expression of doubt on the defendant's identity as the robber during cross-examination of her. The witness' credibility is clearly a question for the jury. *State v. Glidden* (1974), 165 Mont. 470, 473, 529 P.2d 1384, 1386. Nor did the evidence support dismissal or a directed verdict as urged by defendant. The underlying question is whether there is no evidence upon which a jury could base its verdict. *State v. Yoss* (1965), 146 Mont. 508, 514, 409 P.2d 452, 455. Clearly, there was.

Next, defendant contends the prosecutor effectively testified through the bartender by her manner of examination. Defendant does not specify which questions were prejudicial or explain the substance of the alleged prejudice. Since there is neither a pattern of leading questions nor any particular question which could be characterized as a vehicle for prosecution testimony, defendant's silence on these points is understandable.

It is contended this case is "saturated with gross misconduct on the part of the prosecuting attorney" and should be reversed on that ground. Specific instances cited include references made during her opening statement, her manner of cross-examining both Wendell and defendant's mother and allegedly abstracting an involuntary statement from Wendell. We are unable to consider the contentions made with respect to these utterances by reason of defendant's failure to object to them at trial.

Defendant did object to certain questions asked of Wendell. However, a careful reading of the transcript shows no clear prose-

sutorial misconduct warranting reversal. Similarly, the handling of Wendell precedent to his subpoena for trial manifests no reversible error. The record shows the State learned of Wendell's plan to leave town and so avoid testifying too late to serve a subpoena on him that day. He was therefore picked up and held overnight. The next day he was served with a subpoena and released.

Defendant's specifications of error (1) that Deputy Harrington's testimony on the line-up identification was hearsay, (2) that Wendell's testimony on the content of his statement to the authorities was hearsay, and (3) that certain comments by the trial judge prejudiced his case, cannot be reviewed because of defendant's failure to object properly at trial.

It is alleged that error occurred by the court's admission into evidence of the statement Wendell made to the authorities and of the knife identified by the bartender and seized from defendant. Defendant also claims the court should have admitted the second written statement which asserted the first statement was involuntary. We find sound basis in the court's rulings on the admissibility of these items reflected in the record and see no reason to repeat them.

Defendant next contends both the knife line-up and suspect line-up procedures were improper. He fails to designate however, how these identification procedures resulted in undue prejudice. Relevant factors in evaluating the likelihood of misidentification at the pretrial line-up include the opportunity of the witness to see and the degree of attention focused on the criminal at the time of the crime, the accuracy of the witness' prior description, the level of certainty maintained by the witness and the length of time between the crime and the line-up identification. *State v. Oppelt* (1978), 176 Mont. 499, 580 P.2d 110, 113-114. Applying these factors to this case, no impropriety is demonstrated.

Defendant alleges error in the court's grant of prosecution's motion *in limine* to restrict the testimony of his mother. The prosecutor learned defendant's mother would testify on the

defendant's whereabouts during the approximate time of the robbery and successfully argued since notice of an alibi defense was not given as required by section 95-1803(3), R.C.M.1947, such testimony should be excluded. Defendant's exclusive contention is that his mother's testimony would not have supplied an alibi, but would merely have established his presence at her house before the robbery took place. The time frame involved is approximately 1:15 p.m. until 2:15 on the afternoon of the robbery. State's evidence placed defendant at "Mom's Cellar" about 1:15 p.m. as a customer and 2:00 p.m. as a robber. Defendant's mother's testimony apparently would have placed him at her house between 1:30 p.m. and 2:15 p.m. that afternoon. No abuse of discretion was committed in characterizing such as an alibi. *State v. Babella* [1978], Mont. 581 P.2d 838, 841, 35 St.Rep. 985, 989.

Study of the instructions selected for the clear prejudice as contended by defendant. No compelling argument is now made in his challenge of them.

Ultimately, defendant contends the persistent felon's statute, section 95-1506, R.C.M.1947, as applied to the facts of this case violates his constitutional right to due process and, if not, was untimely filed.

The record in the instant case reveals that plea negotiations were in progress until Thursday, June 2, 1977, when defendant demanded a jury trial. Trial was set for June 6, 1977, the following Monday. On Friday, June 3, 1977, the State served written notice under section 95-1506, R.C.M.1947, that it would invoke the persistent offenders statute in the event of a conviction.

On Monday, June 6, 1977, defendant filed a motion to prevent the State from relying on defendant's prior conviction, contending the State had failed to give timely notice. The District Court ruled "the practice in the State of Montana is that the statute applies upon commencement of trial."

Defendant contends that under the facts of this case, notice which was given on a Friday afternoon, preceding a scheduled Monday trial, effectively gave defendant only 3 hours notice the

State would seek increased punishment under the pesistent offender statute.

The record does not reveal whether during the plea bargaining process the county attorney had or had not threatened to invoke the increased punishment. We do not therefore, have a detailed showing on the record, as we did in *State v. Sather* (1977), 172 Mont. 428, 564 P.2d 1306, 1310, that the persistent offender statute was used "in an attempt to coerce defendant into waiving his right to a jury trial."

■ Irrespective of what we may have said in *State v. Sather*, supra, it is now clear from the United States Supreme Court that a prosecutor is not prohibited from seeking increased punishment for prior convictions after the plea bargaining process had broken down. In *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (Rehearing denied March 16, 1978), 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511, the Supreme Court said:

"In those cases the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction—a situation 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and the defense, which arguably possess relatively equal bargaining power.' *Parker v. North Carolina*, 397 U.S. 790, 809, 90 S.Ct. 1485, 25 L.Ed.2d 785 (opinion of Brennan, J.). The Court has emphasized that the due process violation in cases such as *Pearce* and *Perry* lay not in the possibility that a defendant might be deterred from the exercise of a legal right, see *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584; *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714, but rather in the danger that the State might be retaliating against the accused for lawfully attacking his conviction. See *Blackledge v. Perry*, supra, 417 U.S. [21], at 26-28, 94 S.Ct. 2098, 40 L.Ed.2d 628.

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, see *North Carolina v. Pearce*, supra, 395 U.S. [711], at 738, 89

S.Ct. 2072, 23 L.Ed.2d 656 (opinion of Black, J.), and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.' (Cases cited.) But in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer. . . .

"Plea bargaining flows from 'the mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial. *Brady v. Unites States*, supra, 397 U.S. [472], at 752, 90 S.Ct. 1463, 25 L.Ed.2d 747. Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. Id., at 758, 90 S.Ct. 1463, 25 L.Ed.2d 747. Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial. See ABA Standards Relating to Pleas of Guilty § 3.1 (1968); (Citing cases.)

"While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' *Chaffin v. Stynchcombe*, supra, 412 U.S., at 31, 93 S.Ct. 1977, 36 L.Ed.2d 714. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty." *Bordenkircher v. Hayes*, 434 U.S. at 357, 98 S.Ct. at 667, 668, 54 L.Ed.2d at 610, 611.

Here, the county attorney had the right to seek increased punish-

ment, whether plea bargaining negotiations were in progress or not. There is no record of retaliation on his part. The only question presented by the instant case is whether the giving of the notice violates due process insofar as defendent is concerned.

Section 95-1506, R.C.M.1947, provides in part:

"When the state seeks increased punishment of the accused as a prior convicted felon under section 94-4713, notice of that fact must be given in writing to the accused or his attorney before the entry of a plea of guilty by the accused, or before the case is called for trial upon a plea of not guilty."

We hold here that the words "called for trial" contained in section 95-1506, mean that moment in time when the District Court, in the regular course, calls out the number and title of the cause and determines that the parties are present and ready for trial; in other words, the beginning of the trial. Under the statute, at any point prior to that moment, notice may be given by the county attorney to the accused or to his attorney that the State seeks increased punishment, where a not-guilty plea has been entered. This is the accepted meaning of the term "called for trial". See *Moore v. Sargent* (1887), 112 Ind. 484, 14 N.E. 466, 468; *McGrew v. State* (1892), 31 Tex.Cr.R. 336, 20 S.W. 740.

Inasmuch as the county attorney had the option in this case in any event to seek increased punishment, we see no deprivation of due process in the giving of notice by the county attorney at the time he did before trial that he would seek such increased punishment.

Accordingly, the judgment of District Court in this cause is affirmed in all respects.

MR. JUSTICE HASWELL and JUSTICES DALY and HARRISON concur.

MR. JUSTICE SHEA dissenting:

I would affirm the conviction but I would reverse on the issue of sentencing. The prosecution should not have been allowed to rely, under the circumstances of this case, on the persistent felony of-

fender statute because notice was given in violation of due process of law.

When the majority acknowledges "the only question presented . . . is whether the giving of notice violates due process insofar as defendant is concerned;" they fail to address the issue. Instead, the decision rests on literal construction of the statute under which due process was allegedly violated. It is not enough to say the prosecutor's conduct complied with the statute; our duty is to determine the constitutionality of the statute and state action taken under it.

In *State v. Sather* (1977), 172 Mont. 428, 564 P.2d 1306, this Court analyzed the constitutionality of state action under the persistent felony offender provision and found due process was denied when it was invoked on the eve of trial. The decision was firmly grounded on the United States and *Montana* Constitutional due process provisions. We need not adopt the rationale and standards expressed in *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 98 S.Ct. 663, 65 L.Ed.2d 604. I think we are sadly misled in doing so. The 5 to 4 decision is of little moment. Its narrow ruling began:

"It may be helpful to clarify at the outset the nature of the issue in this case. While the prosecutor did not actually obtain the recidivist indictment until after the plea conferences had ended, his intention to do so was clearly put forth at the outset of the plea negotiations. Hayes was thus fully informed of the true terms of the offender when he made his decision to plead not guilty. This is not a situation therefore, where the prosecutor without notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty." *Bordenkircher v. Hayes*, supra, 434 U.S. at 357, 98 S.Ct. at 666, 54 L.Ed.2d at 609.

The Court thus clearly distinguished the case of a prosecutor with full prior knowledge of defendant's prior conviction, who invoked the harsher penalty for defendant's withdrawal of a guilty plea on appeal. The cases treat such "unilateral" imposition of a more severe sentence in response to defendant's exercise of a constitutional right as "vindictive" or "retaliatory", and an impermissi-

ble denial of due process. *United States V. Ruesga-Martinez* (9th Cir. 1976), 534 F.2d 1367, 1369; *Blackledge v. Perry* (1974, 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628, 634; *North Carolina v. Pearce* (1969), 395 U.S. 711, 725, 726, 89 S.Ct. 2072, 2080, 2081, 23 L.Ed.2d 656,˙669, 670. I agree with the dissenters in *Bordenkircher*:

"Prosecutorial vindictiveness, it seems to me, in the present narrow context, is the fact against which the Due Process Clause ought to protect. I perceive little difference between vindictiveness after what the Court describes, ante, p. 667, as the exercise of a 'legal right to attack his original conviction,' and vindictiveness in the 'give-and-take negotiation common in plea bargaining.' Prosecutorial vindictiveness in any context is still prosecutorial vindictiveness. The Due Process Clause should protect an accused against it, however, it asserts itself." *Borkenkircher v. Hayes*, supra, 434 U.S. at 357, 98 S.Ct. at 670, 54 L.Ed.2d at 613, 614 (Blackmun, J., Brennan, J., Marshall, J. dissenting.)

Moreover, we cannot say that the State's action in the instant case was part of a "give-and-take" or bilateral negotiation process for the very reason the majority cited; we do not have a well-documented record before us.

If we are to adopt the "give-and-take" plea negotiation analogy, we must embrace it fully. All bargaining contemplates the parties' appreciating at the outset certain and definite terms of the bargain. There can be no "mutuality of advantage" enjoyed by the parties without full disclosure of the terms involved. Here, we have no record that defendant was apprised of what was at stake in negotiation.

The timing of notice given in this case raises an inference of retaliation on the prosecutor's part which offends due process. The prosecutor should at least be obligated to show that invocation of the persistent felony offender statute was included in the broken plea negotiations.

The meaning the majority ascribes to the phrase "called for trial" "(section 95-1506, R.C.M.1947), renders the notice require-

ment to which it refers meaningless. Notice, after all, is intended to inform the recipient in time to act or react. It would not be legislating to deem the notice required be reasonable. While it may be argued to require reasonable notice would only prompt aggressive prosecutors to invoke the statute as a matter of course, this unfortunate happenstance is far preferable to inviting prosecutors to threaten or retaliate and defendants to guess, gamble and hazard surprise.

When examined in light of the arraignment process, the importance of reasonable notice is better appreciated. It is at arraignment that defendant must enter his plea. Section 95-1506, R.C.M. 1947. If he pleads guilty, and if the prosecutor has not served him with notice prior to his plea, by the clear terms of section 95-1506, R.C.M.1947, the prosecutor is foreclosed from invoking the persistent felony offender statute. Therefore, the State has a duty to act promptly, evaluate the defendant's background and determine if the public interest will be served by seeking a harsher penalty in order to avoid foreclosure should defendant plead guilty. Assuming the prosecutor performs this duty, it seems unfair to impose different standards on when to notify defendant of this decision depending solely on whether defendant pleads guilty or not guilty. It is unfair to provide no standard because defendant pleads not guilty. There is no rational basis for the distinction.

By holding notice of intent to rely on prior convictions for sentencing need only be given before trial commences, the Court is encouraging prosecutorial gamemanship of the most offensive nature. Defendant is clearly entitled to a reasonable time to prepare for trial. Section 94-1907, R.C.M.1947. At some point in time prior thereto defense counsel should be relatively secure in advising his client on the advantages and disadvantages of accepting a tendered plea or going to trial. I believe the Court is here setting a dangerous precedent. If plea negotiation is to have any fair meaning, the prosecutor's cards should be placed on the table in the negotiation process and long before trial commences.