No. 87-432

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

STATE OF MONTANA,

       Plaintiff and Respondent,

-vs-

JOEL GILPIN,

       Defendant and Appellant.

---

APPEAL FROM: District Court of the Thirteenth Judicial District
In and For the County of Yellowstone
The Honorable G. Todd Baugh, Judge Presiding

COUNSEL OF RECORD:

    For Appellant:

        Stephen C. Moses; Moses Law Firm, Billings, Montana

    For Respondent:

        Honorable Mike Greely, Attorney General, Helena, Montana
        Patricia J. Schaeffer, Assistant Attorney General
        Harold F. Hanser, County Attorney, Billings, Montana
        Donna Heffington, Deputy County Attorney

---

Submitted on Briefs: March 11, 1988

Decided: May 11, 1988

Filed: **MAY 1 1 1988**

_Ethel M. Harrison_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This matter is on appeal from the District Court of the Thirteenth Judicial District, Yellowstone County, wherein a jury found Joel Gilpin guilty of two counts of sexual assault. We affirm.

Mr. Gilpin presents eight issues for review:

1. Did the District Court commit reversible error by denying defendant's motion for mistrial when the prosecution referred to certain statistics during voir dire?

2. Did the court err by admitting evidence of other crimes, wrongs, or acts?

3. Did the court err by denying defendant's motion to compel psychiatric examination of the victims?

4. Did the court err by denying defendant's motion to dismiss on grounds that the State failed to establish the element of "sexual contact"?

5. Did the court err by refusing three of defendant's offered instructions?

6. Was the evidence sufficient to convict the defendant?

7. Did the court err by admitting, at the sentencing hearing, evidence of other acts?

8. Did the court err by sentencing defendant to two consecutive terms?

In the early evening hours of October 31, 1986, Halloween night, the defendant Joel Gilpin and a friend were at the home of a female co-worker. She had to work until later that evening so Mr. Gilpin and the other man were helping her three children get ready for Halloween trick-or-treating.

The woman's 11 year old daughter testified that she and Mr. Gilpin were sitting on the downstairs couch and that no

one else was in the room with them.  She then testified as follows:

Q.  And what happened first?
A.  Well I was leaning over to get something, I think it was a blanket and then I felt his hand like on my back butt.
Q.  On your back butt, where would that be.
A.  My cheek.
A.  Okay.  And what was his hand doing?
A.  Oh, was kind of like rubbing.
Q.  What happened next?
A.  Well then I sat back down and his hand was still there, he was like squeezing.
Q.  Was his hand on the side of your butt then when you sat back down?
A.  No, I was sitting on his hand like.
Q.  So his hand was underneath your butt?
A.  Yes.
Q.  And what was he doing with his hand?
A.  He was like squeezing.
Q.  Squeezing what?
A.  My butt.
Q.  How did that make you feel?
A.  It felt weird.
Q.  What did you do?
A.  Well I couldn't really do anything because then he picked me up and put me on his lap.
Q.  And when he put you on his lap, what did he do?
A.  Well he had one hand on my butt and then one hand between my legs.
Q.  Where between your legs, . . . ?
A.  On my inner thigh.
Q.  How far up or down on your inner thigh?
A.  Well about five inches away from my vagina.
Q.  Okay.  What was he doing with his hand when he had his hand on your inner thigh?
A.  He was rubbing and then he kind of like moved up.
Q.  Toward your vagina?
A.  Yeah.
Q.  How did you feel about that?
A.  It felt weird.
Q.  What did you do, . . . ?
A.  I got up and I went upstairs because someone called me or else the doorbell rang.

. . .

Q. When you were upstairs will you tell the jury what happened.

A. Well I was, I went and I just shut the door 'cause they were trick or treating and I don't know if anybody else was upstairs and then Joel came up from behind me and he like started at my waist and started coming up towards my breasts and he was saying stuff like he hardly ever gets to see me, and things.

. . .

Q. All right. And you said he was moving his hands up?

A. Uh huh.

Q. How far up did he move them?

A. Right under my breasts.

Q. What did you do?

A. Well I stepped on his toe and I left.

Q. Did you make any effort to push his hands down?

A. Yeah, I did, then he kept moving back up.

Q. And that's when you stepped on his toe?

A. Yes.

Q. And did you do it purposely or was it an accident?

A. Purposely.

Q. And why did you step on his toe?

A. So I could get away.

The 11 year old testified that, after getting away, she went downstairs again, sat down, and began whiting her shoes. She said that Mr. Gilpin came downstairs and went into the bathroom.

The girl's 12 year old sister testified that she had dressed in her costume, had put on her makeup, and was standing in front of the bathroom mirror when Mr. Gilpin came in and stood in the doorway. She testified that Mr. Gilpin asked her what she was going to be for Halloween. She testified, in part, as follows:

Q. Did you answer him?

A. Yes.

Q. What did you tell him?

4

A.  A prostitute or hooker or whatever.

Q.  Did he respond to that in any way?

A.  Yes.

Q.  What did he do?

A.  He said he wishes he could be my first customer.

Q.  Did he say that from the doorway where he was standing?

A.  Yeah, and I think he kinda walked towards me.

. . .

Q.  Where did he stand?

A.  Behind me.

Q.  Several feet behind you?

A.  No.

Q.  How close behind you?

A.  So I could feel him.

Q.  Did he say anything to you when he came and stood behind you?

A.  He just kept repeating, "I wish I could be your first customer".

Q.  Did you say anything back about that?

A.  No.

Q.  Now when he stood behind you so that you could feel him saying he would like to be your first customer, do you know what he was doing with his arms?

A.  Yes, he put them under my arms.

Q.  Where were his hands?

A.  On my breasts.

. . .

Q.  What was he doing with his hands?

A.  He was rubbing like.

Q.  Now you were wearing your sweater at that time, right?

A.  Yeah.

. . .

Q.  When Joel did these things to you, . . . ., what did you do?

A.  I tried to wiggle away.

Q.  You tried to wiggle away?

A.  Yes.

. . .

Q.  Were you able to wiggle away?

A.  Yeah.

Q.  Okay.  Did you then leave the bathroom?

A.  I tried to.

Q.  What happened?

5

```
A.   He grabbed my arm.
Q.   Where did he grab you?
A.   On the wrist.
Q.   And what did he do?
A.   He just was saying no, no.
Q.   Okay.  Did he just let you stay out there
at the end of his arm?
A.   No, he kind of pulled me back again.
Q.   What did you do then?
A.   I told him that I thought I heard the
doorbell ring.
```

She testified that during this time she was yelling, "help . . . help me," to her 11 year old sister.  Her sister heard the yelling but thought she was "joking around."  Mr. Gilpin, however, let the 12 year old go when she said she heard the doorbell ring.  She said she and her sister ran upstairs and "decided we would stick together the whole night."  She explained, "We decided that so he wouldn't try anything on us, together we thought maybe he couldn't do anything when we were together."

Neither of the girls told anyone about these incidents that night.  A week or so later, the 11 year old wrote a note to her mother, explaining the problems the girls had been having with Mr. Gilpin.  She specifically described the bathroom incident between her older sister and Mr. Gilpin.

After receiving the note and discussing the matter with the girls, the mother eventually talked with a detective from the Billings Police Department.  The mother and two girls each gave statements to the detective concerning the incidents.  The girls also received counselling from a psychotherapist.  The 11 year old saw the therapist twice, and the 12 year old saw her five or six times.  The therapist was not called to testify at trial by either party.

Mr. Gilpin denied all of these allegations.  At the conclusion of trial, the jury returned a verdict of guilty on both counts of sexual assault, § 45-5-502, MCA.  The District

6

Court sentenced Mr. Gilpin to a term of four years imprisonment on each count, to be served consecutively.

I

Did the District Court commit reversible error by denying defendant's motion for mistrial when the prosecution referred to certain statistics during voir dire?

During voir dire, the deputy county attorney referred to a statistical probability that one in every five men and one in every three women have been molested before the age of eighteen. The defense objected that this was an offer of testimony. The court informed the prospective jurors that this was neither testimony nor evidence to be considered by them. The prosecution then asked if any of the potential jurors or people close to them had been victims of sexual abuse. At this point defense counsel moved the court to declare a mistrial. The court denied the motion.

The defense argues that the prosecution was attempting in voir dire to personalize information in the form of statistics for which there was never any testimony at trial. He claims the information tainted the entire jury panel. Mr. Gilpin does not present any evidence to support this allegation of prejudice.

The appellant must show by clear and convincing evidence, practically free from doubt, that the trial court's ruling on a motion for mistrial was erroneous. State v. Murray (Mont. 1987), 741 P.2d 759, 762, 44 St.Rep. 1394, 1397. Although we are not convinced that the prosecutor's statements were either necessary or appropriate, we conclude that any taint created by those statements was remedied by the court's admonishment to the jury that the statements were not evidence and that only sworn testimony and tangible evidence could be considered. We hold that the record does

7

not contain clear and convincing evidence that the trial court's ruling was erroneous.

## II

Did the court err by admitting evidence of other crimes, wrongs, or acts?

Mr. Gilpin objects to certain testimony of the two victims which included descriptions of other prior incidents between himself and the victims. He argues that these acts are inadmissible as other crimes, wrongs, or acts under Montana law. This Court outlined the proper test for admissibility of other crimes or acts in State v. Stroud (Mont. 1984), 683 P.2d 459, 465, 41 St.Rep. 919, 924-25:

> Rule 404(b) provides that:
> "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
> Admissibility is also governed by specific substantive and procedural rules. The four substantive requirements are (1) similarity between the crime charged and the previous crimes, wrongs or acts; (2) nearness in time between the charged crime and the previous crimes, wrongs or acts; (3) tendency to establish a common scheme, plan or system; and (4) determination that the probative value of the evidence is not substantially outweighed by the prejudice to the defendant. Jensen, supra, 153 Mont. at 239, 455 P.2d at 634 and Rule 403, Mont.R.Evid. In addition, three procedural guidelines must be followed: (1) notice to the defendant prior to trial that evidence of other crimes, wrongs or acts will be introduced; (2) an admonition by the judge to the jury when the evidence is introduced that it is admitted solely for one or more of the accepted purposes stated in Rule 404(b); and (3) a cautionary jury instruction to the same effect, providing in unequivocal terms that the evidence is admitted for the purpose

8

earlier stated and not to try and convict the defendant for prior wrongful conduct. Just, supra, 184 Mont. at 274, 602 P.2d at 963-64.

a. Similarity between crime charged and previous acts

The prior acts contained in the State's notice consisted of the following:

> (a)  In spring of 1986 . . . when [the 11 year old] was sitting on the defendant's lap during a game of Trivial Pursuit, he put his hand on her thigh, moved his hand to her inner thigh, and began rubbing upward on her inner thigh.
> (b)  During the summer of 1986 . . . defendant put his arms around [the 12 year old], and hugged her tight for a long time, while telling her to call him if she ever needed to talk, and held her so tight she could feel his penis against her.

Mr. Gilpin, in his brief, concedes that the incidents involving the 11 year old were similar. He contends that the incidents involving the 12 year old had "absolutely no similarity." Concerning the 12 year old girl, Mr. Gilpin was charged with standing very close behind her and rubbing her breasts. It is not necessary that the prior acts and the charged offense be identical. State v. Tecca (Mont. 1986), 714 P.2d 136, 138, 43 St.Rep. 264, 267. We conclude that the other acts were sufficiently similar to the charged offense to justify admission of the evidence. State v. Long (Mont. 1986), 726 P.2d 1364, 1367, 43 St.Rep. 1948, 1951.

b.  Nearness in Time

Mr. Gilpin concedes that the incidents were near in time.

c.  Tendency to establish a common scheme, plan, or system

The evidence of other acts in this case appears consistent with the crime charged and suggests the defendant's desire to gratify his sexual desires by fondling the girls at different times. What Mr. Gilpin contends on appeal is that

9

the State, by dropping the language "continuing course of conduct" from the information, somehow agreed that these incidents did not constitute a common scheme, plan, or system. As the District Court noted when the information was amended, "continuing course of conduct" was not an element of the crime charged and properly was dropped as surplusage. We conclude that amendment of the information in this way did not estop the State from presenting evidence of other acts tending to show a common scheme, plan, or system.

### d. Probative value versus prejudicial effect

Mr. Gilpin contends that the other acts involved could have sexual connotations or could as easily be viewed as common experiences of life. He argues that Rule 404(3)(b), M.R.Evid., requires that only acts which have been proven to be wrongful or criminal may be admitted, not acts which may be ambiguous. Evidently he is arguing that to be probative enough to substantially outweigh prejudice, an act must be criminal in nature. He cites no authority for this position, and we find no support for it in the rule itself. Evidence otherwise inadmissible under the rule may be admitted for the limited purpose of helping to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The District Court ruled that the evidence was admissible for this purpose, and we see no clear error in that decision. The defense had the opportunity to cross-examine these witnesses, and the jury then had this testimony to weigh in its determination. The evidence tended to corroborate the children's allegations and was probative of absence of mistake or accident. We conclude that the prejudicial effect of the evidence does not outweigh its probative value.

10

## e. Notice

Mr. Gilpin argues that the State did not give proper notice, as required by <u>Just</u>, that evidence of other crimes, wrongs, or acts would be introduced. Defense counsel did not receive notice until May 26, the day before trial. The defense filed a motion in limine to exclude the evidence of other acts at trial and objected to the notice as untimely. We stated in State v. Case (Mont. 1980), 621 P.2d 1066, 1071, 37 St.Rep. 2057, 2063, and again in <u>Murray</u>, 741 P.2d at 764, that "the State must provide written notice to the defendant, <u>before</u> <u>the</u> <u>case</u> <u>is</u> <u>called</u> <u>for</u> <u>trial</u> . . ." (Emphasis added). This simply means that notice must be given before the trial has actually begun. State v. Johnson (1978), 179 Mont. 61, 70, 585 P.2d 1328, 1333. We hold that the State's notice was timely.

## f. Admonition

Mr. Gilpin takes issue with the court's admonition to the jury concerning the evidence of other acts. He contends that the result of the court's admonition is that the jury received the court's opinion that the otherwise innocent acts were in fact wrongful or criminal. The court admonished the jury as follows:

> Ladies and gentlemen of the jury, evidence may be introduced during the course of this trial that may show that defendant may have committed other acts at other times which might be seen as wrong. By other acts at other times I mean other than the ones for which he is on trial. You may not consider any such evidence to prove that the defendant is a person of bad character, or that he has a disposition to commit crimes or that he committed the crime of which he now stands accused. You may only consider this evidence for the limited purposes of providing a characteristic method, plan or scheme that may have been used in the commission of the offense in this case. You may also consider this evidence to prove existence of intent, in other

11

words, acting knowingly, which is an element of the crime charged. You may not consider this evidence for any other purpose as to do so might expose the defendant to unjust and double punishment.

In Just, 602 P.2d at 964, we explained what procedures must be followed with regard to admonition and instructions to the jury:

> (b) At the time of the introduction of such evidence, the trial court shall explain to the jury the purpose of such evidence and shall admonish it to weigh the evidence only for such purposes.
> (c) In its final charge, the court should instruct the jury in unequivocal terms that such evidence was received only for the limited purposes earlier stated and that the defendant is not being tried and may not be convicted for any offense except that charged, warning them that to convict for other offenses may result in unjust double punishment.

We conclude that the trial court properly admonished and instructed the jury on this point. We hold that the District Court properly admitted this evidence of other crimes, wrongs, or acts.

III

Did the court err by denying defendant's motion to compel psychiatric examination of the victims?

Mr. Gilpin argues that no physical or psychological evidence existed in this case to corroborate the girls' testimony. He says that had the court granted his motion to compel psychiatric examination of the victims, he might have been able to show they did not suffer from post-trauma syndrome. He then urges, "If the child does not have the trauma, then the event did not occur." This argument merits little discussion. While we have held that expert testimony is "admissible for the purpose of helping the jury to assess the credibility of a child sexual assault victim," State v.

12

Geyman (Mont. 1986), 729 P.2d 475, 479, 43 St.Rep. 2125, 2131, we have not by any means held that expert testimony is necessary or required. The prosecution is not required to prove psychological trauma, and the absence of evidence of psychological trauma logically does not prove that the offense did not occur. The defendant cannot force psychological evaluation of a child victim of sexual assault. As stated by this Court in State v. Liddell (Mont. 1984), 685 P.2d 918, 924, 41 St.Rep. 1293, 1300:

> There is no legal authority for such a procedure. Rule 35(a), M.R.Civ.P., allows for a mental or physical examination by a physician when the mental or physical condition of a party is in controversy. The victim in this matter is a witness, not a party to this action.

We hold that the District Court did not abuse its discretion by denying defendant's motion to compel psychiatric examination of the victims.

IV

Did the court err by denying defendant's motion to dismiss on grounds that the State failed to establish the element of "sexual contact"?

Mr. Gilpin contends that the State failed to prove beyond a reasonable doubt that he subjected the girls to any "sexual contact". That term is defined at § 45-2-101(60):

> "Sexual contact" means any touching of the sexual or other intimate parts of the person of another for the purpose of arousing or gratifying the sexual desire of either party.

Thus, the defendant must (1) touch the sexual or other intimate parts of the girls, (2) for the purpose of arousing or gratifying his or the girls' sexual desires. He argues that the State failed in its proof of both elements. The standard

13

of review for sufficiency of the evidence was first stated in Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; and restated in State v. Geyman (Mont. 1986), 729 P.2d 475, 476, 43 St.Rep. 2125, 2126.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

As to the 12 year old victim, we conclude that the test set forth in Geyman is satisfied. A rational trier of fact could have concluded that Mr. Gilpin rubbed the girl's breasts for the purpose of arousing or gratifying his sexual desires.

As to the 11 year old victim, Mr. Gilpin argues that he did not touch an intimate part of her body. The evidence was that he had rubbed and squeezed her buttocks with his hand. He then placed her on his lap, and, with one hand still on her buttocks, he began rubbing her inner thigh while moving his hand toward her vagina. Then, upstairs, he placed his hands at her waist and began to move his hands up until they were under her breasts. She then stepped on his toe and ran downstairs.

In State v. Weese (1980), 189 Mont. 464, 616 P.2d 371, the defendant pulled a 9 year old girl "onto his lap, pulled up her shirt and began rubbing her belly and chest but did not make contact with her nipples." He then offered her a dollar if she would allow him to continue. This Court construed that conduct as prohibited sexual contact should the jury determine defendant had the purpose to gratify his sexual desires. Weese, 616 P.2d at 374. This Court discussed the purpose of the statute:

14

> Use of the terms "sexual or other intimate parts" indicates that the legislature did not intend to restrict the crime to a touching of the genitalia of either sex or a touching of a female's breast, but instead intended to give the terms a broader application. In keeping with the focus of sexual assault statutes on the outrage, disgust or shame engendered in the victim, other courts have held that the term "intimate parts" in such statutes include the buttocks . . . the hips . . . and the prepubescent chest of a 7-year old girl . . . (omitting citations).

Weese 616 P.2d at 374. We conclude that Mr. Gilpin's conduct here fits within the type of contact prohibited by the legislature. We are not convinced by Mr. Gilpin's suggestion that he must touch the girl under her clothing before sexual contact can occur. Nothing in the statute suggests such a restricted reading. Mr. Gilpin further argues that no evidence exists to establish that he had the purpose of arousing or gratifying his sexual desires. We conclude that a rational trier of fact could infer the requisite intent from Mr. Gilpin's conduct. State v. Kestner (Mont. 1986), 713 P.2d 537, 540, 43 St.Rep. 155, 159. We hold that the District Court properly denied Mr. Gilpin's motions to dismiss.

V

Did the court err by refusing three of defendant's offered instructions?

Mr. Gilpin argues that the court erred by failing to give three of his offered instructions. Offered instruction no. 5 stated that defendant cannot be convicted on conjecture, suspicion, or probability. He bases this instruction upon State v. Keckonen (1938), 107 Mont. 253, 84 P.2d 341. We distinguish that case from the present case because Keckonen relied upon a statute providing that conviction cannot be had on uncorroborated testimony of an accomplice.

15

Further, the defendant's concerns on this point were covered by the District Court's instruction no. 1, stating in pertinent part,

> The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

Defendant's offered instruction no. 5 also defined "reasonable doubt". We conclude that instruction no. 8, given by the court, covered this elemant.

Offered instruction no. 10 tells the jury that there must be a joint action of act and mental state. We conclude that the elements of the offense were stated and covered in the given instructions which properly instructed that Mr. Gilpin must be found, without a reasonable doubt, to have acted with the requisite mental state.

Offered instruction no. 19 was an attempt to inform the jury that the mental state of the victims does not establish the mental state of the defendant, that the mental state of defendant must be proved beyond a reasonable doubt. We conclude that other instructions given by the court properly stated the law as to mental state. We hold that the given instructions as a whole properly tendered the case to the jury. State v. Bingham (Mont. 1987), 745 P.2d 342, 349, 44 St.Rep. 1813, 1820-21. We therefore affirm the District Court's refusal of defendant's offered instructions.

VI

Was the evidence sufficient to convict the defendant?

We have already set forth the standard of review for sufficiency of the evidence in a criminal case, under Issue IV. We concluded that any rational trier of fact could have found the essential element of "sexual contact". Section 45-5-502(1), MCA, also requires the State to prove the

defendant "knowingly" subjected the girls to sexual contact. Mr. Gilpin's argument is that the State produced no evidence to corroborate the girls' testimony, and therefore could not prove its case beyond a reasonable doubt. This Court, in Just, 602 P.2d at 962, stated the rule in Montana:

> [I]n sex offense cases in Montana, the victim's testimony does not need to be corroborated. State v. Metcalf (1969), 153 Mont. 369, 378, 457 P.2d 453, 458; State v. Gaimos, 53 Mont. at 126, 162 P. at 599.

This rule applies to testimony of a child victim as well. State v. Howie (Mont. 1987), 744 P.2d 156, 159, 44 St.Rep. 1711, 1716. At trial the girls testified concerning Mr. Gilpin's conduct. Through this and other testimony, the jury was asked to determine whether Mr. Gilpin knowingly subjected the girls to sexual contact. He claims that it is his testimony against the girls' testimony. The court gave instruction no. 7 to the jury at Mr. Gilpin's request. It read as follows:

> As a matter of law, where two witnesses testify directly opposite to each other on a material point and are the only ones that testify on that same point, you are not bound to consider the evidence evenly balanced or the point not proved; you may regard all the surrounding facts and circumstances proved on the trial and give credence to one witness over the other if you think the facts and circumstances warrant it.

After review of the record, including the trial transcript, we hold that a rational trier of fact could have found that Mr. Gilpin knowingly subjected the girls to sexual contact.

VII

Did the court err by admitting, at the sentencing hearing, evidence of other acts?

17

Mr. Gilpin objects to two letters contained in the sentencing file. One letter was written by a boy who claimed his friend was molested by Mr. Gilpin while in a swimming pool. The other letter was written by the boy's mother. Mr. Gilpin objects because he had no opportunity to cross-examine these witnesses. In Williams v. New York (1949), 337 U.S. 241, 250, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337, 1343-44, the United States Supreme Court discussed this concern:

> We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life.

As the State points out, the defendant had an opportunity to rebut, deny, or explain this incident, thus his due process right was not violated. See State v. Orsborn (1976), 170 Mont. 480, 555 P.2d 509.

> [T]he right of cross-examination at a presentence hearing is a discretionary matter of the trial court and will not be overruled without a showing of abuse of that discretion.

State v. Trangsrud (1982), 200 Mont. 303, 307, 651 P.2d 37, 39; see also § 46-18-113(1), MCA.

Mr. Gilpin also objects to testimony at the hearing by a 13 year old girl who reported an incident involving him. He claims that although he had the opportunity to cross-examine the witness, he had no opportunity to prepare. We note, however, that Mr. Gilpin did not request a continuance to allow for preparation, although at the sentencing hearing, the court offered defense counsel that opportunity. Mr. Gilpin failed to request a continuance, and we will not

review the matter now as it is raised for the first time on appeal. Trangsrud, 651 P.2d at 40. We hold that the District Court did not err by admitting the evidence.

## VIII

Did the court err by sentencing defendant to two consecutive terms?

Lastly, Mr. Gilpin asserts that the alleged incidents arose out of the same transaction or event; hence, he should not be subjected to consecutive terms. Our review of the District Court's Judgment and Commitment shows that the court properly considered the factors listed in § 46-18-101(3), MCA. We also note that the sentence imposed falls within the legal limits under § 45-5-502(3), MCA. Therefore, we hold that the District Court did not abuse its discretion in sentencing. State v. Almanza (Mont. 1987), 746 P.2d 1089, 1091, 44 St.Rep. 2064, 2067.

Affirmed.

_____
Justice

We Concur:

_____
_____
_____
_____
Justices