No. 90-213

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

       Plaintiff and Respondent,

v.

ROY LEE DUNCAN,

       Defendant and Appellant.

**FILED**

FEB 14 1991

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Broadwater,
The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

           J. Mayo Ashley, Esq., Helena, Montana

       For Respondent:

           Hon. Marc Racicot, Attorney General; James
Yellowtail, Assistant Attorney General, Helena,
Montana

           John Flynn, County Attorney, Townsend, Montana

Submitted on Briefs: December 20, 1990

Decided: February 14, 1991

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Roy Lee Duncan appeals his convictions of robbery and deliberate homicide through accountability following a jury trial in the First Judicial District, Broadwater County. We affirm.

Duncan presents the following issues on appeal:

1. Were Ursla Smith, Sherry Hendricks and Ginny Penn accomplices, and if so, did independent evidence sufficiently corroborate the accomplice testimony?

2. Is the evidence in this case sufficient to support a conviction of deliberate homicide through accountability?

3. Is the felony murder rule under § 45-5-102(1)(b), MCA, constitutional?

In July, 1989, Roy Lee Duncan, along with five other adults and three small children, traveled to Montana in a single car. The adults were members of a self-formed group. The children are incidental to this appeal, and as such, will not be further discussed.

One of the adults, Ernest "Ernie" Mazurkiewicz was considered by other group members as the leader of the group. On June 24, 1989, Ernie instructed the other adults, Roy, Joe Milinovich, Ursla Smith, Sherry Hendricks, and Virginia "Ginny" Penn, to place their fingerprints, made from their own blood, on individual pieces of paper. Each person signed and dated the piece of paper containing their fingerprint. These pieces of paper signified comradery and loyalty to Ernie. Ernie also told the adults that these pieces of

paper meant that they were members with him forever, and the only way they could leave the group was "in a pine box."

While in Big Timber, Montana, Ernie asked Ursla, the treasurer of the group, to give Roy some money to purchase a handgun. Ursla complied, but Roy was unable to purchase the handgun because he was an out-of-state resident. The group eventually drove to Billings, Montana, where Roy and Ursla went to the local driver's licensing bureau and attempted to obtain Montana driver's licenses for in-state identification. Both Roy and Ursla paid $12.00 to a clerk at the driver's licensing bureau in order to apply for a driver's license, and both received a receipt from the clerk. Ursla passed the required written driver's license examination, and the clerk properly validated her receipt making it a learner's permit. Roy, however, failed the written examination, and accordingly, the clerk did not validate his receipt as a learner's permit. Ursla, however, upon Ernie's request, falsified Roy's receipt to make it appear that Roy passed the test, and was a recipient of a learner's permit.

The group then left Billings and Roy purchased two handguns by using his falsified learner's permit as identification; one of the handguns, a .22 caliber FIE revolver, was purchased in Columbus, Montana, and the other, a .25 caliber Loricin semi-automatic, was purchased in Big Timber, Montana. Ursla testified that following the purchases of the handguns, she overheard Ernie telling Roy how to commit robberies. Sherry and Ginny testified

3

that following the purchases of the handguns, they were aware that the handguns were going to be used to rob.

The group proceeded west on Interstate 90 through Montana, and on the evening of July 24, 1989, stopped at a convenience store outside of Bozeman. Roy, Ernie, Ursla, and Joe went inside the convenience store; Sherry and Ginny remained in the car. While in the convenience store, Roy engaged in conversation with Larry Beckwith, who was en route to Alaska where he had an employment opportunity. Following his conversation with Larry, Roy informed Ernie that Larry could obtain employment for them in Alaska.

Together with Ernie, Roy again talked with Larry to further pursue the notion of possible employment opportunities in Alaska. Apparently, after this conversation and a phone call placed by Larry to Alaska, Larry agreed to take Roy, Ernie, and Joe to Alaska and help them find jobs.

Larry and the group left the convenience store simultaneously and headed north toward Townsend, Montana. Joe rode with Larry in his red pick-up truck and the rest of the group followed Larry's pick-up in their car. Shortly after leaving the convenience store, Larry's pick-up truck pulled off the highway; the group's car also stopped. Roy then joined Larry and Joe in the pick-up and the vehicles once again continued to drive down the highway with the pick-up leading the way. Later, the pick-up pulled off the highway again and the car likewise pulled over. A brief exchange occurred, but the riders in the vehicles remained the same: Larry, Roy, and

4

Joe rode in the pick-up and the rest of the group rode in the following car.

Sometime later, Larry's pick-up began to swerve on the highway; Ernie, the driver of the group's car, passed the pick-up, drove through Townsend, and then pulled the car over to the side of the highway and waited for the pick-up. The pick-up eventually pulled up behind the group's car, whereby the pick-up then led the car down a secondary road off of the main highway.

At this point Ernie asked Ursla to hand him Duncan's handgun, the loaded .22 caliber FIE revolver, which was located in the passenger side panel of the car; Ursla complied. Both vehicles once again pulled off the road. Ernie got out of the car and joined Roy who was standing in the roadway. Joe was standing in a nearby ditch straightening his clothes. Ernie handed Roy the handgun and told Roy that the group was going to spend the night at a rest area. Ernie then got back into the car, and the car drove off, leaving Roy, Joe, Larry and the pick-up behind.

About forty-five minutes later, the car and the pick-up met at an exit ramp outside a nearby town. After both vehicles pulled over, Roy got out of the pick-up and handed Larry's wallet to Ernie; Ernie gave the wallet to Ursla for safe-keeping. The vehicles then proceeded to a gas station and later to a rest area. At the rest area, Ursla testified that after she inquired about what happened on the secondary road, Roy stated that he "overtook" Larry and "sent Mr. Beckwith to hell where he belonged." Ginny

testified that Roy said "that he had got the guy, didn't know how many times he had shot him and that Joe had hit him with a rock but he wouldn't go down." Additionally at the rest area, Ernie, who had regained possession of the .22 caliber FIE revolver, emptied the handgun and took out the shells.

The car and pick-up proceeded on to a second rest area, and stayed a brief time. Upon leaving this second rest area, the car and pick-up truck headed south on Interstate 15. Ursla, Sherry, and Ginny testified that, at this point, they fell asleep in the car. The three testified that they were awakened when Roy and Joe, who had been riding in Larry's pick-up, entered the car with Larry's possessions. At this point, the three women became aware that the pick-up was ablaze.

Larry's truck was later reported to be burning on Interstate 15 approximately six miles north of Dillon, Montana, and authorities later identified that the pick-up belonged to Larry from the pick-up's license plate.

At around noon on July 25, 1989, a detachment from the Montana National Guard discovered Larry's body on an abandoned portion of Highway 12 approximately 2.2 miles north of Townsend, Montana. An investigation revealed that Larry had been robbed due to the absence of his identification, wallet, or personal property, and the fact that Larry's rear pant's pockets were turned inside out. An autopsy revealed that Larry had died at around midnight on July 25, 1989, from "internal bleeding and injuries of the spinal cord

6

and structures at the base of the skull due to the gunshot wound of the head." A firearms expert testified that the bullets recovered from Roy's body were .22 caliber and could only have been fired from one of "approximately eight different brands of firearms" including an FIE revolver.

The group, meanwhile, drove to Las Vegas, Nevada. Roy, Joe, and Ginny separated from the group in Las Vegas, and proceeded to Texas. Some time later, law enforcement officials in Las Vegas, determined that Ernie, Ursla, and Sherry may have been involved in the homicide of Larry in Montana. When questioned by the officials, all three discussed Larry's homicide and implicated various members of the group. Subsequently, Roy was also arrested in Las Vegas after he returned from Texas, and Ginny was arrested in Springfield, Missouri, where she had fled after leaving Texas. At the time Roy was arrested, he was wearing a belt owned by Larry, which had Larry's name printed on the back. Joe was arrested sometime later in New Jersey.

Following his extradition to Montana, Ernie was charged with robbery and deliberate homicide through accountability. Alternatively, he was charged with deliberate homicide under the felony murder rule. Initially, Ernie pled not guilty to these charges, however, on December 19, 1989, he changed his pleas and pled guilty to robbery through accountability and deliberate homicide under the felony murder rule. He is currently serving sentences in prison for these offenses. Joe later pled to the same charges as Ernie,

and is also currently imprisoned. The original charges against Ursla were reduced to robbery. Ursla pled guilty to robbery and is currently imprisoned for this offense. The charges against Sherry and Ginny were dismissed.

On October 13, 1989, following his extradition from Las Vegas, Roy was charged by information with the offense of Count I, deliberate homicide under § 45-5-102(1)(a), MCA, charged alternately as Count II, deliberate homicide through accountability under §§ 45-5-102(1)(a), 45-2-301, and 45-2-302, MCA, and Count III, deliberate homicide under the felony murder rule, § 45-5-102(1)(b), MCA. Later, this information was amended to charge the offenses of Count I, robbery under § 45-5-401, MCA, and Count II, deliberate homicide through accountability under §§ 45-5-102(1)(a), 45-2-301, and 45-2-302, MCA, charged alternatively as Count III, deliberate homicide under the felony murder rule, § 45-5-102(1)(b), MCA. From the record, testimony at trial established that while Roy was imprisoned at the Broadwater County jail awaiting trial, he admitted to a cell-mate that he shot Larry five times in the face.

Following a jury trial on January 5, 1990, Roy was found guilty of Count I, robbery, and Count II, deliberate homicide through accountability. On March 19, 1990, the District Court sentenced Roy to forty years imprisonment on Count I and 100 years imprisonment for Count II, both sentences to run consecutively. The District Court additionally designated Roy a dangerous offender for parole purposes. From his convictions, Roy appeals.

1. Were Ursla Smith, Sherry Hendricks and Ginny Penn accomplices, and if so, did independent evidence sufficiently corroborate the accomplice testimony?

First, appellant asserts that Ursla, Sherry and Ginny were accomplices with Roy because all three women were members of this self-formed group and actively participated in the group's activities. Moreover, the appellant asserts that these women were accomplices because they were present during the commission of the crimes, and knew what was unfolding. Second, appellant asserts that as accomplices, their testimony was not sufficiently corroborated by other witness testimony at trial as required under § 46-16-213, MCA.

The State argues that Sherry and Ginny were not accomplices because they were not involved in the planning and commission of Roy's offenses, and therefore, their testimony is not subject to § 46-16-213, MCA. The State further argues that although Ursla was an accomplice and was subject to corroboration under § 46-16-213, MCA, independent evidence established a nexus between Roy and the robbery and homicide of Larry, which corroborated Ursla's testimony. We agree with the State's contentions.

The definition of an accomplice is well-settled:

> This concept has been the subject of much attention in case law. We have emphasized that mere presence at the scene of a crime is not enough to charge one as an accomplice. [Citations omitted.] Moreover, the knowledge that a crime is about to be committed does not

9

make one an accomplice. [Citations omitted.]
A true accomplice is:

"'one who knowingly, voluntarily and with common intent with the principal offender unites in the commission of a crime . . . One may become an accomplice by being present and joining in the criminal act, by aiding and abetting another in its commission, or not being present, by advising and encouraging its commission; but knowledge and voluntary actions are essential in order to impute guilt.'" [Citations omitted.]

State v. Nordahl (1984), 208 Mont. 513, 517, 679 P.2d 241, 243. Here, although group members Sherry and Ginny were at the scene of the crimes, and were aware that the handguns purchased by Roy were going to be used to rob, no evidence exists in the record to indicate that they knowingly or voluntarily and with common intent with Roy, united in the preparation, planning, or commission of the robbery and homicide of Larry. We therefore hold that Sherry and Ginny were not accomplices, and accordingly, their testimony was not subject to the corroboration requirements under § 46-16-213, MCA.

Ursla, however, was an accomplice to these crimes. The record clearly indicates that she knowingly and voluntarily participated in procuring the handgun used in the robbery and homicide of Larry by falsifying Roy's Montana identification. Therefore, Ursla's testimony is subject to § 46-16-213, MCA, which provides:

A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, as defined in 45-2-301, unless the testimony is corroborated by other evidence which in itself and without the aid of

10

> the testimony of the one responsible or legal-
> ly accountable for the same offense <u>tends to
> connect the defendant with the commission of
> the offense</u>. The corroboration is not suffi-
> cient if it merely shows the commission of the
> offense or the circumstances thereof.

(Emphasis added.) Here, because Sherry and Ginny were not accomplices, the matter of corroborating Ursla's testimony is clearly established by the record--virtually all of the aspects of Ursla's testimony appeared in either or both of Sherry's or Ginny's testimony. Therefore, the testimony of Sherry and Ginny corroborated Ursla's testimony.


2. Is the evidence in this case sufficient to support a conviction of deliberate homicide through accountability?

The standard of review for sufficiency of the evidence is, "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; <u>restated in</u> State v. Wilson (Mont. 1981), 631 P.2d 1273, 1278-79; State v. Geyman (1986), 224 Mont. 194, 195-96, 729 P.2d 475, 476; State v. Gilpin (1988), 232 Mont. 56, 68, 756 P.2d 445, 451; State v. Kao (Mont. 1990), ___ P.2d ___, ___, 47 St.Rep. 2100, 2102; State v. Walters (Mont. 1991), ___ P.2d. ___, ___, 48 St.Rep. 102, 106.

Appellant argues that the record does not contain sufficient

11

evidence to prove that Roy actually shot and killed Larry. Appellant's argument lacks merit. The evidence did not have to prove that Roy actually shot and killed Larry as Roy was charged and convicted of deliberate homicide through accountability under §§ 45-5-102(1)(a), 45-2-301, and 45-2-302, MCA. The amended information, in Count II, alleged that Roy, "purposely or knowingly caused the death of Larry Beckwith by shooting him with a gun, or, with the purpose of promoting or facilitating the commission of such offense, aided or abetted Joseph Milinovich in the planning or commission of the offense of the deliberate homicide of Larry Beckwith . . . ." The record, through the testimony of Ursla, Sherry and Ginny, as well as other witnesses, overwhelmingly indicates that Roy either shot Larry, or aided or abetted Joe in doing so. Roy was the person who approached Larry at the convenience store near Bozeman, and gained Larry's trust. Roy was handed the .22 caliber FIE revolver shortly before Larry's death. Roy admitted that he shot Larry to other group members shortly after the shooting. Roy was arrested wearing Larry's belt, and while imprisoned and awaiting trial, Roy admitted to a cell-mate that he shot Larry in the face five times. Moreover, even if Roy did not actually shoot Larry, Roy aided and abetted Joe, the only other person, besides Larry present in Larry's pick-up that night, by giving Joe the .22 caliber FIE revolver.

Appellant also argues that absent Ursla, Sherry, and Ginny's testimony, the so-called accomplice testimony, the record contains

12

insufficient evidence to convict Roy of deliberate homicide. Because we have already held that Sherry and Ginny were not accomplices, and that their testimony properly corroborated Ursla's testimony, no need exists to further discuss appellant's latter contention. We therefore hold that sufficient evidence existed in the record to support Roy's conviction of deliberate homicide through accountability.

3. Is the felony murder rule under § 45-5-102(1)(b), MCA, constitutional?

Appellant moved to dismiss Count III of the amended information, deliberate homicide under the felony murder rule, on December 28, 1989. The record does not indicate whether the District Court ruled on the appellant's motion. Because there is no record of the dismissal of Count III, the appellant raises the issue of the constitutionality of the felony murder rule in this appeal. Appellant's argument is inappropriate with regard to this case. The jury did not convict Roy of the alternative charge of Count III. Accordingly, this issue is not ripe for determination. We therefore decline to discuss the constitutionality of the felony murder rule with regard to this case.

Affirmed.

_____
Chief Justice

13

We concur:

_____

_____

_____

_____
Justices

14