No. 92-156 and 92-231

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

STATE OF MONTANA,

Plaintiff and Respondent,

-v-

WILLIAM GOLLEHON,

Defendant and Appellant.

FILED

OCT 2 0 1993

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Ed P. McLean, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Michael Donahoe and Mark Yeshe, Helena, Montana

For Respondent:

Hon Joseph P. Mazurek, Attorney General, Jennifer
Anders, Assistant, Helena, Montana; Christopher G.
Miller, Powell County Attorney, Deer Lodge, Montana;
John P. Connor, Assistant Attorney General and
Special Deputy Powell County Attorney, Helena,
Montana

Submitted: May 26, 1993

Decided: October 20, 1993

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal from a verdict and sentence from the Third Judicial District Court, Powell County, finding Gollehon guilty of deliberate homicide by accountability and sentencing him to death. We affirm.

We consider the following issues on appeal:

1. Did the District Court err by allowing State's counsel and co-defendant Turner's counsel to question prospective jurors during voir dire about the possibility of the death penalty being imposed (known as "death qualification")?

2. Did the District Court abuse its discretion by refusing to dismiss or continue the trial because of an alleged discovery violation by the State?

3. Did the District Court abuse its discretion in refusing to allow Gollehon to inquire into evidence of prior crimes committed by one of the State's eyewitnesses?

4. Did the District Court err in denying Gollehon's motion to declare Montana's death legislation illegal and unconstitutional?

5. Did the District Court err by failing to rule, as a matter of law, that no aggravating circumstances existed?

6. Did the District Court err by failing to rule, as a matter of law, that mitigating factors existed and that such mitigating factors were substantial enough to call for leniency?

7. Did the District Court err by sentencing Gollehon to death for the crime of deliberate homicide by accountability?

8. Did the District Court properly refuse to consider Gollehon's argument that death by hanging constitutes cruel and unusual punishment?

9. Should this Court uphold Gollehon's death sentence on automatic review?

While the opinion in State v. Turner, Cause Nos. 92-157 and 92-161, sets out the facts of the homicide at issue with great detail, we briefly summarize the events of September 2, 1990.

2

Corrections officers Larry Spangberg and Karl Beckerleg were making a routine walk around the track in the exercise yard of the Montana State Prison. A softball game was in progress. As they walked the track which circled the baseball diamond, the officers noticed the players had begun to drift to the side of the yard. As they approached the backstop, they found the badly beaten body of Gerald Pileggi. Two baseball bats lay by his body.

Inmates have exercise time from 1 p.m. to 2:15 p.m. and from 2:15 p.m. to 3:45 p.m. Once in the exercise yard, inmates must stay there until the period is over. At the time of the beating, 250 inmates were in the exercise yard, including prison inmates from the high security section of the prison, known as the "highside." After officers found Pileggi, the yard was "called in" and inmates were searched. Nothing suspicious was found.

Medical personnel were dispatched to the yard. Pileggi was still alive when taken from the yard but was having trouble breathing because of all the blood in his throat. The prison nurse was unable to recognize that the prisoner was Pileggi. Pileggi died while being air-lifted to St. Patrick's hospital in Missoula.

An autopsy performed by Dr. Gary Dale, a State Medical Examiner, revealed that Pileggi had died of multiple injuries to the head and trunk. Dr. Dale was able to identify at least four blows, including a massive blow to the top of the head which caused the skull to cave in and a major blow to the left side of the face which collapsed the left side of the forehead and caused the brain to tear and the eyeball to rupture. Also identified were a blow to

3

the jaw which fractured the upper and lower jaws, a blow to the breastbone, and another to the shoulder. Pileggi's arms had bruises which indicated a struggle had taken place.

The blows to the brain were identified as fatal because they tore the brain. Dr. Dale testified that most of the blows could have been delivered while Pileggi was standing but the blow to the left side of the head was delivered while Pileggi was on the ground. The blow to the left side of the skull collapsed the skull and pulpified the brain.

Following the beating, Pileggi's cell was searched and a calendar containing notations was discovered. Because of this calendar, the investigation centered on three inmates: Douglas Turner, William Gollehon and Daryl Daniels. The notations on the calendar documented confrontations with these individuals, all of whom worked in the "highside" kitchen before they were terminated because of suspected assaults on other inmates.

Correction officials describe an increasing tension in the month before Pileggi's death between kitchen employees who were non-sex offenders and those who were sex-offenders. Of the sex-offenders, several, including Pileggi, were physically beaten by other kitchen inmate employees. The victims would not reveal who was responsible for the injuries.

Pileggi told corrections officers that three inmates had dragged him into the dish room in the kitchen and beat him up, but refused to identify who the three were. Gollehon, Turner and

4

Daniels worked in the dish room. After this incident, the three were removed from the staff, just days before Pileggi's death.

Because of the above incidents and Pileggi's calendar notes, Gollehon, Turner and Daniels were removed from their cells and their cells were searched. In Gollehon's cell, officials found a pair of prison pants, with blood on them, and a towel stuffed into a pillow case. The bottoms of the pant legs had been ripped off and officers could see blood spatters on the remaining part of the pants. The towel also had blood on it. A forensic serologist was unable to verify that the blood was Pileggi's.

Gollehon, Turner and Daniels were placed in maximum security. A number of inmates were interviewed but no one would give the names of those responsible for the beating death of Pileggi, despite the large number of inmates in the yard when Pileggi was murdered. In January 1991, an eyewitness came forward and agreed to testify in exchange for his guaranteed safety. This led to the filing of charges against Gollehon and Turner.

The inmate, J.D. Armstrong, testified that he was playing baseball in the exercise yard the day Pileggi was beaten. Armstrong testified that he was approached by Gollehon who asked him which baseball bat was used the least. Armstrong testified that he suspected Gollehon was going to start a fight with Pileggi because Gollehon had indicated that he was going to "mess him up." Armstrong also testified that he saw Gollehon confront Pileggi with a baseball bat as Pileggi came around the track to the baseball field backstop.

5

Armstrong noted that the two struggled for control of the bat just prior to Turner's arrival at the scene. Armstrong saw Turner hit Pileggi on the left side of his face, after which Pileggi fell to the ground. Armstrong testified he then saw Turner and Gollehon each deliver four or five more blows before throwing the bats onto Pileggi's body.

Armstrong testified that as soon as the other inmates realized what was happening they quickly left the baseball diamond. Armstrong told Gollehon afterwards that he should do something about his pants because they were blood spattered. Gollehon responded with profanity, according to Armstrong.

Another inmate, William Arnot, corroborated Armstrong's testimony. He further testified that he did not see Daryl Daniels in the exercise yard on that day.

A defense witness testified that nine or ten inmates were involved and that after they pulled away, he saw a man lying on the ground. He testified he could not recognize any of the inmates. Other witnesses testified that they were playing with, or had seen, Gollehon and Turner playing horseshoes at the time of the beating. Another witness testified that Armstrong was not on the softball field the day of Pileggi's death but was playing dominoes with him in the gym.

On January 10, 1991, an information was filed in Powell County District Court charging Gollehon and Turner with deliberate homicide for the beating death of Pileggi. On May 17, 1991, the information was amended to charge the defendants jointly with

6

deliberate homicide or, in the alternative with deliberate homicide by accountability. Prior to trial the State gave notice to defendants that it would seek the death penalty in the event of a conviction. Following a joint trial, the jury found each defendant guilty of deliberate homicide by accountability.

A separate sentencing hearing was held for Gollehon on February 27, 1992. The District Court determined that leniency was not warranted because the mitigating factors did not sufficiently outweigh the aggravating circumstances. On March 19, 1992, Gollehon was sentenced to death by hanging because he had not exercised his option to choose death by lethal injection. Gollehon appealed and the District Court stayed Gollehon's execution pending resolution of this appeal. While Turner presents us with only three issues on appeal, Gollehon puts forth nine issues for resolution.

I

Did the District Court err by allowing State's counsel and co-defendant Turner's counsel to question prospective jurors during voir dire about the possibility of the death penalty being imposed (known as "death qualification")?

Before voir dire began, Gollehon made an oral motion in limine requesting the court to prohibit the State from asking jury panel members to declare their beliefs concerning the death penalty. Gollehon's argument was that Montana juries do not participate in the sentencing portion of trial and, therefore, questioning the members about a possible sentence was inappropriate. Gollehon further argued that social science evidence proves that when a jury is "death qualified" it is more prone to convict the defendant.

7

The judge took the motion under advisement and asked co-defendant Turner to respond to his stance on the issue. Turner responded that he felt the jury should be death qualified. Gollehon then moved the court to sever his trial from Turner. The court denied the motion.

Gollehon claims that under Montana law, if the jury panel knows that the death penalty could be imposed upon conviction, the error is prejudicial per se. Further, Gollehon argues that the process of death qualification results in juries that are more conviction prone and that represent certain identifiable groups in society. According to Gollehon, such questioning of jurors and the resulting challenges for cause by attorneys produce unrepresentative juries and violate his constitutional rights of due process under both the state and federal constitutions. Gollehon, therefore, seeks a reversal of his conviction and a new trial.

Gollehon has presented a constitutional challenge pursuant to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution concerning the trial court's questioning of jurors during voir dire to determine their views on the death penalty (death qualification). The State argues that Montana law specifically provides for death qualification of juries pursuant to § 46-16-115(2)(h), MCA, which provides:

> (2) A challenge for cause may be taken for all or any of the following reasons . . . (h) if the offense charged is punishable with death, having any conscientious opinions concerning the punishment as would preclude finding the defendant guilty, in which case the person must neither be permitted nor compelled to serve as a juror;

8

According to the State, jurors cannot be dismissed simply because they have doubts about the death penalty but only if their beliefs for or against such penalty would prevent or impair their performance as a juror. This statute follows guidelines laid out by the Supreme Court of the United States in Witherspoon v. Illinois (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, and further defined by Wainwright v. Witt (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. In Witherspoon, the United States Supreme Court ruled that a death sentence cannot be carried out if the jury that imposed or recommended it was chosen by excluding prospective jurors for cause simply because they voiced general objections to the death penalty. State v. Coleman (1978), 177 Mont. 1, 579 P.2d 732. Witherspoon provided an exception to this rule: if a prospective juror is irrevocably committed to voting against conviction because of the possibility of a death penalty, he may be excused for cause.

Montana codifies the Witherspoon rule in § 46-16-115(2)(h), MCA. Our statute permits a juror to be excused not for his or her mere belief or disbelief in the use of the death penalty, but only in instances where that belief prohibits the juror from applying the law which the judge has provided.

> The death qualifying voir dire is, thus, more extensive than a mere inquiry into the venireperson's views on the death penalty . . . [it is] "deep probing as to the opinions held" including exploration of whether the venirepersons can consider the full range of punishment under the facts alleged in the case before them. . . . This qualification is a two-step process. First, the experiences, opinions or views of the venireperson are uncovered by questions asked by the court and attorneys. Second, a determination is made by the trial court as to

9

whether those experiences, opinions or views will prevent or substantially impair the person's duties as a juror in accordance with the instructions and oath.

P. Peters, Capital Voir Dire: A Procedure Gone Awry, 58 UMCK Law Review, 603, 623 (1990).

Gollehon presents us with social science studies which seem to indicate that death-qualifying a jury prejudices a defendant. We note that the U.S. Supreme Court has considered studies such as these and rejected them. In fact, we note that one of the authorities cited by Gollehon in support was used in Lockhart v. McCree (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137, and rejected by the U.S. Supreme Court.

In Lockhart, the Supreme Court seriously questioned the validity of such studies. See M. Peters, Constitutional Law: Does "Death Qualification" Spell Death for Capital Defendant's Constitutional Right to an Impartial Jury? 26 Washburn Law Journal, 382, 394 (1987). McCree argued the same thing that Gollehon argues here that "death qualification" violated the fair cross section requirement of the Sixth Amendment and violated his due process rights. The U.S. Supreme Court disagreed, holding that defendant was entitled to a fair cross section of the jury panel and not the final jury selected. Lockhart, 476 U.S. at 174, 106 S.Ct. at 1764, 90 L.Ed.2d at 148. We agree with the Court's assessment that to have a cross-section of the jury would require a Herculean effort and be "unworkable and unsound." Lockhart, 476 U.S. at 174, 106 S.Ct. at 1765, 90 L.Ed.2d at 148.

10

Gollehon's due process arguments are likewise without substance. In Lockhart the U.S. Supreme Court considered the studies individually and expressly ruled that even if valid, the studies did not prove death qualification was unconstitutional. Like the U.S. Supreme Court and Montana, many jurisdictions in this country have determined that death qualification is constitutional and does not infringe upon the accused's due process rights. Johnson v. State (Fla. 1992), 608 S.2d 4; Pickens v. Lockhart (E.D.Ark. 1992), 802 F.Supp. 208; Clayton v. State (Okl.Ct.App. 1992), 840 P.2d 18; People v. Hill (Cal. 1992), 839 P.2d 984 and State v. Harris (Tenn. 1992), 839 S.W.2d 54. One state has determined that a defendant who wished to engage in death qualification of the jury and was prohibited by the court from so doing was denied due process of law. People v. Smith (Ill. 1992), 604 N.E.2d 858.

Gollehon's statement that any mention of death as a penalty is prejudicial per se in Montana is incorrect. He cites State v. Herrera (1982), 197 Mont. 462, 643 P.2d 588 and State v. Brodniak (1986), 221 Mont. 212, 718 P.2d 322. Neither case is a capital case nor even hints at such a pronouncement on death qualification.

While Gollehon's point concerning the bifurcation of the guilt and sentencing portions of Montana trials is noted, we do not conclude that such division automatically precludes the death qualification process. Every defendant is entitled to a jury that will follow the court's instructions and act impartially. If a juror, despite the instructions by the court, will refuse to

11

consider conviction because of his or her strong belief concerning the possible death sentence, the juror's dismissal is appropriate. Adams v. Texas (1980), 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581, 593.

Here the court and counsel questioned the jury panel adequately. The judge excused one panel member because she could not assure the court that she would be able to follow the court's instructions during trial because of her strong stance against the death penalty. Such exclusion is proper according to § 46-16-115(2)(h), MCA.

We conclude that the greater weight of authority indicates that death qualification as a procedure to insure a jury committed to its task is constitutional. We, therefore, hold that the District Court did not err by allowing the State's counsel and co-defendant Turner's counsel to question prospective jury members during voir dire about the possibility of the death penalty.

II

Did the District Court err by refusing to dismiss or continue the trial because of an alleged discovery violation by the State?

Gollehon claims he learned of a possible discovery violation during the course of the trial. He then moved the court for dismissal or in the alternative for a continuance. Both motions were denied.

Gollehon argues on appeal that Powell County Undersheriff Scott Howard (Howard) interviewed hundreds of inmates concerning Pileggi's death. According to Gollehon not all of these interviews had ensuing reports; nor were contents of interviews containing

12

information inconsistent with the physical evidence released to the defense. Gollehon argues that the circumstances attendant to Pileggi's murder were common knowledge throughout the prison. Therefore, Gollehon argues that information withheld from him could have been significant in discrediting the State's two alleged eye-witnesses. According to Gollehon, the State had a legal obligation to provide him with the information gleaned from these interviews.

The State contends that six months prior to trial it sent Gollehon a list of file materials in its possession, one of these files was a list of inmates questioned and a list of inmates interviewed by Howard and Tom Blaz, deputy investigator at the Montana State Prison. Further, the State filed its notice of disclosure pursuant to § 46-15-322, MCA. The State further argues that Gollehon's motion to dismiss came long after he supposedly became aware of the alleged violation. The State argues that none of the inmates interviewed implicated anyone other than Gollehon and Turner. Therefore, the State claims that the untimely objection combined with Gollehon's lack of proof that the information not presented to him could have been material, casts serious doubt on the legitimacy of Gollehon's claimed discovery violation.

Gollehon's motion to dismiss is in effect a motion requesting the court to exercise its discretion to dismiss the charges on its own and in the furtherance of justice. Section 46-13-401, MCA (formerly 46-13-201, MCA). See State v. Roll (1983), 206 Mont. 259, 670 P.2d 566. This Court will review a district court's

13

decision to dismiss criminal charges by determining whether the lower court abused its discretion in view of the constitutional rights of the defendant and the interest of society. Roll, 206 Mont. at 261, 670 P.2d at 568. A motion for a continuance is reviewed for abuse of discretion. State v. LaPier (1990), 242 Mont. 335, 790 P.2d 983; § 46-13-202(3), MCA.

The pivotal concern here is whether the State failed to provide the defense with pertinent, exculpatory evidence. Suppression of evidence by the State of facts that would be favorable to the defendant constitutes a violation of defendant's due process rights. Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. This evidence, known as "Brady Material," must be intentionally or deliberately suppressed by the investigating officers in order for the act of suppression to be a due process violation per se. Sadowski v. McCormick (1991), 247 Mont. 63, 805 P.2d 537.

Negligently suppressed evidence violates due process only if it is material and of substantial use, vital to defense, and exculpatory. Sadowski, 247 Mont. at 79, 805 P.2d at 547. Officials investigating this murder had no duty to obtain exculpatory evidence favorable to the defense, but must avoid interference with the efforts on the part of the accused to obtain such evidence. Sadowski, 247 Mont. at 79, 805 P.2d at 546.

Investigators for the State provided the defense with lists containing 213 pieces of evidence it had gathered in the case. Number 71 on the list is noted as:

14

1 page list of inmates interviewed by Deputy Howard and Tom Blaz.

Number 103 on that list states:

1 page list of inmates questioned, dated 9-2-90.

It was up to Gollehon to request these items:

**Disclosure by prosecution.** (1) Upon request, the prosecutor shall make available to the defendant for examination and reproduction the following material and information within the prosecutor's possession or control . . . (Emphasis added.)

Section 46-15-322(1), MCA. The record does not indicate such a request was made.

More importantly, nothing prevented Gollehon from questioning anyone at the prison. The State was under a duty to provide statements from inmates it planned to use as witnesses. Section 46-15-322(1)(a), MCA. The State was not under a duty to investigate the entire case for Gollehon.

Gollehon states "it is fair to speculate that at least some of the information garnered from these other witnesses was accurate." This Court will not sanction such "speculation." Gollehon was free to question inmates and put them on the stand. He chose not to do that. Having made the decision, he cannot now claim a discovery abuse. Of paramount importance is the fact Gollehon provides no evidence whatsoever that any exculpatory evidence would have been obtained. Speculation of exculpatory evidence is not enough to show it to be "of substantial use" or "vital to the defense."

We conclude that the State met its responsibility in providing Gollehon with a list of its evidence. Therefore, we hold the

District Court did not abuse its discretion in denying dismissal or a continuance.

## III

Did the District Court abuse its discretion in refusing to allow Gollehon to inquire into evidence of prior crimes committed by one of the State's eyewitnesses?

The State offered testimony of two inmates who stated they witnessed the beating death of Gerald Pileggi: J.D. Armstrong and William Arnot. Gollehon sought the court's permission to introduce a past employer of Arnot's who would testify that Arnot stole his Mercedes. Also, Gollehon wished to present evidence of other thefts and burglaries committed by Arnot. The court refused to allow any questions concerning prior acts of theft or burglary, citing Rules 608 and 609, M.R.Evid.

Gollehon argues that the rules of evidence permit him to introduce evidence of a witness's prior bad acts which go to prove the witness's dishonesty. The State contends that at a pretrial hearing all parties agreed to abide by the Montana Rules of Evidence and those rules specifically exclude the use of prior convictions to impeach a witness.

This issue involves Montana Rules of Evidence 608 and 609:

> **Rule 608. Evidence of character and conduct of witness.**
> (a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

16

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the witness' privilege against self-incrimination when examined with respect to matters which relate only to credibility.

**Rule 609. Impeachment by evidence of conviction of crime.**

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is not admissible.

Rule 608(b), M.R.Evid., provides that specific instances of conduct by a witness, for the purpose of attacking or supporting his credibility, may not be proved by extrinsic evidence. State v. Norris (1984), 212 Mont. 427, 689 P.2d 243. The record reveals that Gollehon's attorney wished to question both a prior employer and Arnot himself on cross-examination concerning past acts of burglary and theft. The court correctly refused such questioning.

Rule 608 permits "opinion" testimony concerning truthfulness in order to support or discredit testimony. Gollehon did not attempt to introduce such opinion testimony. The proposed testimony of Arnot's past employer indicating Arnot's theft of the employer's Mercedes constitutes extrinsic evidence of conduct used for the purpose of discrediting a witness and as such is prohibited by Rule 608(b), M.R.Evid.

17

Further, Gollehon's proposed questioning of Arnot on cross-examination as to his own prior acts of theft and burglary is likewise inadmissible. We previously held:

> The testimony as to Phillips' previous misconduct was wholly unrelated to the ability of Phillips to observe, recall or testify as to any relevant occurrences in the altercation between White and Pippin.

State v. White (1983), 202 Mont. 491, 496, 658 P.2d 1111, 1113. Likewise, testimony of previous instances of theft and burglary by Arnot was wholly unrelated to Arnot's truthfulness, ability to observe, recall or testify as to the beating of Pileggi by Gollehon.

Gollehon argues that he should have been able to question Arnot about incidents of theft and burglary because they go to the witness's "habit of doing things that impugned his ability to be credible and to tell the truth." Therefore, Gollehon argues that evidence concerning theft and burglary are admissible to prove truthfulness. Using this reasoning, any criminal act can be said to do the same thing. Gollehon quotes a leading treatise on evidence which lists acts indicating dishonesty: forgery, bribery, suppression of evidence, false pretenses, cheating and embezzlement. J. Weinstein & M. Berger, Weinstein's Evidence, § 608[5], at 608-27 to 608-52 (1988 & Supp. 1990). Burglary and theft are properly absent from this list, yet Gollehon argues that a source used by the authors of the treatise did contain theft and burglary. We decline to read these offenses into the treatise's list.

Gollehon's thinly-veiled proposed questioning of Arnot's prior convictions without mentioning the word "conviction" is not persuasive. Montana's Rule 609, M.R.Evid., is unique; it specifically prohibits evidence of a witness's prior convictions. This Court has been adamant in prior rulings that Rule 609 be strictly enforced:

> [T]he intention on the part of the State [in asking about prior convictions] was to discredit the witness by showing that he had been engaged in crimes of intimidation and assault, and that the intimidation crime involved guns. We further conclude that the aim on the part of the State was to improperly impugn the character of the defendant and thereby suggest a greater likelihood of guilt of the crimes with which he was charged. We will not tolerate this intentional and significant evasion of our rules.

State v. Shaw (1989), 237 Mont. 451, 454, 775 P.2d 207, 208-209.

Gollehon goes on to argue that elimination of this line of questioning worked to deny him his constitutional right of confrontation. The Sixth Amendment to the United States constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." State v. Short (1985), 217 Mont. 62, 67, 702 P.2d 979, 982. This includes the right to cross-examination. Davis v. Alaska (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347.

The court must balance the probative value of relevant evidence as compared with the possibility of prejudice. Short, 217 Mont. at 69, 702 P.2d at 983. If the probative value of evidence is greater, and other evidentiary parameters are satisfied, the evidence is admissible.

19

Admission of evidence resides with the discretion of the court. State v. Crist (1992), 253 Mont. 442, 833 P.2d 1052. Once admitted, however, it is the trier of fact who must determine the weight to be given to each piece of evidence admitted. State v. Bower (1992), 254 Mont. 1, 833 P.2d 1106. Gollehon's argument that the trier of fact was not presented with a crucial line of questioning of Arnot is totally speculative.

> We hold that limiting the extent of the cross-examination on the pending charges in Washington did not violate Short's right to confrontation of witnesses and was not an abuse of the trial court's discretion.

Short, 217 Mont. at 68, 702 P.2d at 982.

Likewise, we conclude that Gollehon's right to confrontation was not denied by the court's restrictions on cross-examination of Arnot. We hold the District Court did not abuse its discretion by refusing to allow Gollehon to inquire into evidence of prior crimes committed by one of the State's eyewitnesses.

IV

Did the District Court err in denying Gollehon's motion to declare Montana's death legislation illegal and unconstitutional?

Gollehon argues that this Court should once again consider the constitutionality of Montana's death penalty legislation. Gollehon contends that the present legislative scheme denies him due process and equal protection under the Fourteenth Amendment to the United States Constitution. The State argues that this Court has already definitively determined that the death penalty statute is constitutional.

20

Gollehon argues that Montana's death penalty statutes violate Article II, Section 28 of Montana's Constitution which provides:

> Laws for the punishment of crime shall be founded on the principles of prevention and reformation. Full rights are restored by termination of state supervision for any offense against the State.

Gollehon argues, as have others before him, that the 1889 Constitution contained a reference to the death penalty and the conscious excision of any mention of this punishment indicates the legislature's unwillingness to use the death penalty. Such is clearly not the case.

The legislature has instituted the death penalty and retains it pursuant to § 46-18-301, MCA. If the legislature of this State intended to do away with the death penalty, it would have repealed this piece of legislation. Further, and more important, if as Gollehon claims, the vote of the people of this State to retain the death penalty was somehow not representative, the people would have objected some time during the twenty-one years since the 1972 referendum.

The State's argument that this Court has previously determined the constitutionality of the death penalty is well taken. Both State v. Langford (1991), 248 Mont. 420, 813 P.2d 936 and State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, have upheld the constitutionality of our death penalty statutes:

> We therefore affirm our holding in McKenzie and hold that Montana's death penalty statutes do not violate Montana Constitution Article II, Section 28.

Langford, 248 Mont. at 441, 813 P.2d at 952.

21

We conclude that Gollehon has raised arguments the Court has considered in the past. We hold that the District Court did not err in denying Gollehon's motion to declare Montana's death legislation illegal and unconstitutional.

V

Did the District Court err by failing to rule, as a matter of law, that no aggravating circumstances existed?

Gollehon argues that the trial court improperly considered the aggravating circumstances as per § 46-18-303(1) and (2), MCA. Gollehon contends that both aggravating factors can only be applied if he was convicted of deliberate homicide and since he was acquitted of deliberate homicide, the aggravating factors do not apply. Further, Gollehon argues that when the sentencing judge considered deliberate homicide he was in violation of the double jeopardy provisions of the Montana Constitution as well as the United States Constitution.

The State contends that Gollehon was convicted of accountability for deliberate homicide and his arguments reflect a misunderstanding of the jury's verdict and the applicable case law.

This presents a question of law which we review de novo. U.S. v. Engesser (9th Cir. Mont. 1986), 788 F.2d 1401, cert. denied, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159. The aggravating factors which are weighed when a court considers the death penalty are found in § 46-18-303, MCA. Here the court considered (1) and (2) as aggravating factors:

> (1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

22

(2) <u>The offense was deliberate homicide</u> and was committed by a defendant who had been previously convicted of another deliberate homicide.

(3) The offense was deliberate homicide and was committed by means of torture.

(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

(6) The offense was deliberate homicide as defined in subsection (1)(a) of 45-5-102, and the victim was a peace officer killed while performing his duty.

(7) The offense was aggravated kidnapping which resulted in the death of the victim or the death by direct action of the defendant of a person who rescued or attempted to rescue the victim.

(8) The offense was attempted deliberate homicide, aggravated assault, or aggravated kidnapping committed while incarcerated at the state prison by a person who has been previously:

(a) convicted of the offense of deliberate homicide; or

(b) found to be a persistent felony offender pursuant to part 5 of this chapter and one of the convictions was for an offense against the person in violation of Title 45, chapter 5, for which the minimum prison term is not less than 2 years.

(9) The offense was deliberate homicide and was committed by a person during the course of committing sexual assault, sexual intercourse without consent, deviate sexual conduct, or incest, and the victim was less than 18 years of age. (Emphasis supplied.)

Section 46-18-303, MCA. Gollehon objects to subsection 1 and 2 as aggravating factors because he claims to have been acquitted of deliberate homicide.

The jury found Gollehon and Turner "not guilty" of deliberate homicide but "guilty" of deliberate homicide by accountability. The jury was instructed that a person is legally accountable for the conduct of another when:

(1) he purposely or knowingly causes another to perform the conduct, regardless of the legal capacity or mental state of the other person; or

23

(2) the statute defining the offense makes him so accountable; or

(3) either before or during the commission of an offense, and with the purpose to promote or facilitate such commission, he solicits, aids, abet, agrees or attempts to aid, such other person in the planning or commission of the offense.

Jury Instruction #11.

The court went on to explain deliberate homicide by accountability:

To convict defendants, or either of them, of Deliberate Homicide by being legally accountable for the conduct of another, the State must prove the following elements:
1.  That the crime of Deliberate Homicide, as defined in Instruction 9 has been committed; and
2.  That either or both of defendants, with common purpose with the other defendant, either before or during the commission of the offense of deliberate homicide, and with the purpose to promote or facilitate such commission solicits, aids, abets, agrees or attempts to aid, the other defendant in the planning or commission of the offense.

If you find from your consideration of the evidence that all these elements have been proved beyond a reasonable doubt, then you should find the defendants, or either of them, guilty of Deliberate Homicide by Accountability, as alleged in Count II of the Information.

If, on the other hand, you find from your consideration of the evidence that any of these elements has not been proved beyond a reasonable doubt then you should find the defendants, or either of them, not guilty of Deliberate Homicide by Accountability, as alleged in Count II of the Information. (Emphasis added.)

Jury Instruction #12.

These instructions clearly and correctly instruct the jury that the offense of deliberate homicide by accountability requires a deliberate homicide and that the defendant(s) acted with common purpose before or during the homicide. The jury did not find Gollehon not guilty of deliberate homicide, but only found he did

24

not act _alone_ during the crime. A charge of deliberate homicide by accountability allowed the jury to convict both men involved in the deliberate homicide without having to make the determination of who struck the fatal blow.

Gollehon cites Enmund v. Florida (1981), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, for the proposition that the Eighth Amendment forbids the imposition of the death penalty against one who neither took life, attempted to take life, nor intended to take life. It is Gollehon's argument that he was acquitted of deliberate homicide and cannot be said to have attempted to take life.

In _Enmund_, the Supreme Court reversed a death sentence levied on the driver of a car involved in a robbery in which several people were killed. Two robbers who had entered the home committed the murders while Enmund waited in the car. The case we have before us is not a felony murder case like _Enmund_. Here, both Gollehon and Turner were convicted of deliberate homicide by accountability. Both Gollehon and Turner were adjudged to have acted in a common plan to kill Pileggi, regardless of who struck the fatal blow.

Gollehon's persistent view that he was acquitted of deliberate homicide is error. Gollehon was found not to have acted alone--he was convicted of acting with Turner in a common scheme to kill Pileggi.

Gollehon's argument that the crime of "accountability" is a separate crime is not correct. The State charged accountability

25

for deliberate homicide so that the jury could convict if they determined Gollehon and Turner aided and abetted each other in the murder of Pileggi.

In State v. Duncan (1991), 247 Mont. 232, 805 P.2d 1387, the appellant following a conviction for deliberate homicide argued that the record did not contain sufficient evidence to prove that he shot and killed the victim.

> The evidence did not have to prove that Roy actually shot and killed Larry as Roy was charged and convicted of deliberate homicide through accountability . . . The record, through the testimony of Ursla, Sherry and Ginny, as well as other witnesses, overwhelmingly indicates that Roy either shot Larry, or aided or abetted Joe in doing so.

Duncan, 247 Mont. at 239, 805 P.2d at 1392.

Because the jury found that Gollehon was guilty of deliberate homicide by accountability the sentencing consideration of whether to use the death penalty for the conviction was not double jeopardy. The jury had already determined that Gollehon had committed deliberate homicide by, at the very least, aiding and abetting Turner. "Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts . . . the judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant . . ." Walton v. Arizona (1990), 497 U.S. 639, 648, 110 S.Ct. 3047, 3054, 111 L.Ed.2d 511, 525.

We hold that the District Court did not err in failing to rule, as a matter of law, that no aggravating circumstances existed.

26

VI

Did the District Court err by failing to rule, as a matter of law, that mitigating factors existed and that such mitigating factors were substantial enough to call for leniency?

Gollehon argues that the court is obliged to review the existence or nonexistence of all mitigating circumstances enumerated in § 46-18-304, MCA. Gollehon further argues that his extensive sexual abuse as a child entitled him to rehabilitation and the only programs in existence within the prison system are provided for women abuse victims, not men. Therefore, Gollehon contends that the mitigating evidence he presented was substantial enough to call for leniency.

The State argues that the District Court considered the mitigating factors of § 46-18-304, MCA, and determined after giving all mitigating factors effect, that leniency was not called for. Further, the State argues that on appeal, Gollehon does not argue any of the specific mitigating factors to be considered under Montana law, but only factors which fall within the "catch all" category of the statute.

This Court is charged on review of a death sentence to consider the punishment as well as any errors enumerated by way of appeal according to § 46-18-310, MCA:

> (1) whether the sentence of death was imposed under influence of passion, prejudice, or any other arbitrary factor;
> (2) whether the evidence supports the judge's finding of the existence or nonexistence of the . . . mitigating circumstances enumerated in . . . 46-18-304, MCA; and
> (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court

27

shall include in its decision a reference to those similar cases it took into consideration.

The District Court issued findings of fact and conclusions of law following a sentencing hearing on February 27, 1992. The findings in regard to mitigating circumstances were structured around the legislative directives of § 46-18-304, MCA:

> **46-18-304. Mitigating circumstances.** Mitigating circumstances are any of the following:
> (1) The defendant has no significant history of prior criminal activity.
> (2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> (3) The defendant acted under extreme duress or under the substantial domination of another person.
> (4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
> (5) The victim was a participant in the defendant's conduct or consented to the act.
> (6) The defendant was an accomplice in an offense committed by another person, and his participation was relative minor.
> (7) The defendant, at the time of the commission of the crime, was less than 18 years of age.
> (8) Any other fact that exists in mitigation of the penalty.

The court reviewed the first seven elements in detail noting that no evidence had been submitted by Gollehon concerning elements one through seven. Gollehon presented evidence concerning subsection 8, the catch-all, which vividly portrayed the inhuman conditions under which he was raised. He presents the same on appeal.

While we acknowledge the severity of Gollehon's traumatic childhood, our responsibility as a reviewing court is to evaluate whether the district court acted without passion or prejudice, under the existence or nonexistence of substantial evidence, and

28

with consideration of whether the sentence given is proportionate to the crime. Section 46-18-310, MCA.

The District Court stated in finding #14 that it had considered and given effect to all Gollehon's mitigating evidence of childhood abuse. The court considered in detail, and without passion or prejudice, the evidence presented by Gollehon. In the end, the court determined that Gollehon had failed to take advantage of any help for problems caused by his childhood abuse and that the evidence concerning his family history was not sufficient to preclude the death penalty.

The Ninth Circuit in reviewing Montana's catch-all subsection to § 46-18-304, MCA, states that as long as the court considers evidence presented under this subsection "[t]he Montana courts were entitled to conclude that the mitigating evidence . . . submitted under the catch all subsection 8 was not persuasive enough to grant a sentence less than death." Smith v. McCormick (9th Cir. Mont. 1990), 914 F.2d 1153, 1165. The findings issued by the District Court clearly show that it cited many instances from Gollehon's past which indicate that he did not attempt to overcome the problems of his childhood abuse.

The court further considered elements from Gollehon's history of institutionalization as mitigating factors. The court stated that despite instances of prior good conduct during his first prison sentence, Gollehon's failure to address his serious personality problems led to even more serious difficulties during

29

his second incarceration, this time for deliberate homicide. The court concluded:

> The defendant has demonstrated that he cannot live within the rules of even a prison society without taking another life. The court feels that he will again kill another human being if the opportunity presents itself.

We note that the court specifically noted that the programs at the prison are inadequate to deal with the personality problems from which Gollehon suffers. However, the record does not show that Gollehon would have benefitted from such programs if they existed, and the court so concluded.

The record also reveals that the court fully disclosed the reasons upon which it based its decision to sentence to death:

> An incomplete record in capital sentencing is constitutionally inadequate: there must be "full disclosure of the basis for the death sentence."

Smith, 914 F.2d at 1166, citing Gardner v. Florida (1977), 430 U.S. 349, 361, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393. The record being complete concerning the court's analyses, Gollehon's constitutional rights have not been violated.

In summation, we conclude that the District Court considered adequate evidence both of aggravating and mitigating factors and considered them in their totality rather than weighing each factor by itself. The court concluded that the evidence presented by the State concerning the aggravating factors was shown "beyond a reasonable doubt." Further, the court stated that when weighed against the mitigating evidence, the cumulative nature of Gollehon's mitigating evidence was not "sufficiently substantial to

30

call for leniency." Walton v. Arizona (1990), 497 U.S. 639, 649, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511, 525.

The proportionality review will be considered later.

We hold the District Court did not err by failing to rule, as a matter of law, that mitigating factors existed and that mitigating factors were substantial enough to call for leniency.

VII

Did the District Court err by sentencing Gollehon to death for the crime of deliberate homicide by accountability?

Gollehon argues that it is not legally permissible to sentence a defendant to death upon a conviction for the crime of deliberate homicide by accountability because no sentence for this crime is set by statute. Again, Gollehon argues he was acquitted of deliberate homicide. According to Gollehon, this Court must interpret ambiguous statutes favorably for the person against whom the enforcement is sought.

The State argues that deliberate homicide by accountability is not a separate crime from that of deliberate homicide. According to the State, conviction of any felony "by accountability" carries with it the sentence for the underlying felony. Further, the State contends that § 45-1-102(2), MCA, dictates that all penal provisions be construed according to the fair import of their terms with a view to effect its object and to promote justice.

We emphasize our prior reasoning concerning deliberate homicide by accountability. Having been found not guilty of deliberate homicide, Gollehon still must contend with his conviction of deliberate homicide by accountability. The dissent

31

states that Gollehon was specifically found not guilty of deliberate homicide and cannot, therefore, be sentenced to death. We disagree. Gollehon was found guilty of <u>deliberate homicide</u> by accountability. No matter how you juggle semantics, Gollehon was convicted of committing a deliberate homicide, the jury simply did not find he acted alone.

The dissent's reasoning only works if accountability is a separate crime for which the legislature failed to provide a remedy. Accountability is not an "off-shoot" homicide. It is a connection provided by our legislature that gives courts and juries a way to make people "accountable" or responsible for a crime that has definitely been committed. The responsibility for the crime attaches by way of acts committed by the accused. The accused either participated in a communal crime or aided, abetted another, or planned the crime.

The dissent refers to § 45-5-102, MCA, which in pertinent part states:

> **45-5-102. Deliberate homicide.** (1) A person commits the offense of deliberate homicide if:
> (a) he purposely or knowingly <u>causes</u> the death of another human being; (Emphasis supplied.)

The dissent concludes that Gollehon was specifically found not guilty of the offense of causing the death of another human being. By its verdict the jury found Gollehon not guilty of deliberate homicide. It also found him guilty of deliberate homicide by accountability. Here we emphasize that § 45-2-302, MCA, previously set out in this opinion, provides that a person is legally accountable for conduct of another when the described events occur

32

- as a result, we conclude that Gollehon's conviction meets the requirements of § 45-5-102, MCA, as he did "cause" the death of Pileggi because he aided and abetted in the commission of the offense of deliberate homicide as required by statute. We therefore conclude that Gollehon has met the specific requirements of § 45-5-102, MCA, by his conduct in which he purposely or knowingly caused the death of Pileggi, whether by his own blow, or the blow of Turner whom he aided and abetted.

The evidence presented at this trial places Gollehon in the middle of a homicide with a bat in his hands. Pileggi was killed either by blows from Gollehon or Turner. Following the dissent's reasoning, anytime the fatal blow in a case cannot be attributed to one person, no person involved can ever get more than ten years as a sentence, no matter how heinous the crime. Thus, according to the dissent, the accountability statute must by its reasoning dilute criminal responsibility of all types rather than making all those responsible for a crime pay the same price. We conclude that the legislature never intended the result that the dissent suggests. We determine that our legislature never meant to dilute responsibility for a criminal act when that act was committed by more than one person, but instead meant that all those participating in a crime be "accountable" for the whole of the responsibility of that act. Here, that act was deliberate homicide, which carries death as a possible sentence,

We note that Montana's statutes § 45-2-301 through 303, MCA, were taken from the Illinois Criminal Code sections 5-1, 5-2 and 5-

3 (1961). This Court has already determined that when Montana adopts statutes from other states, we will also adopt the case law from that state which interprets the statute. State v. Murphy (1977), 174 Mont. 307, 311, 570 P.2d 1103, 1105.

Illinois has specifically upheld the death sentence when applied to those persons found guilty of murder (deliberate homicide in Montana) under the theory of accountability. People v. Stanciel (Ill. 1992), 606 N.E.2d 1201; People v. Ruiz (Ill. 1982), 447 N.E.2d 148.

> A charge based upon accountability must necessarily flow from the principal crime at issue. Accountability is not in and of itself a crime, but rather a method through which a criminal conviction may be reached. Simply, the statute is a statement of the principles of accessoryship.

Stanciel, 606 N.E.2d at 1209.

This reasoning is no different than our own reasoning in prior cases:

> B.D.C.'s challenge on this ground has no basis in law. B.D.C. seems to be arguing that when one is charged with an offense by accountability, he or she is being charged with a separate or different offense. Accountability, however, is merely a conduit by which one is held criminally accountable for the acts of another. There is no separate offense, only the underlying offense which has been physically committed by another, but for which the defendant is equally responsible because of his or her conspiring or encouraging participation.

Matter of B.D.C. (1984), 211 Mont. 216, 220-21, 687 P.2d 655, 657.

Both Gollehon and Turner were convicted of deliberate homicide by accountability. Neither man was "acquitted" of deliberate homicide as they argue, and as the dissent argues, but only of committing the homicide alone. The deliberate homicide occurred;

34

Gerald Pileggi is dead. However, which blow actually caused the death is indeterminable. It is also irrelevant.

> If a person has conspired to commit and facilitated the commission by another of a criminal act, he is no less guilty because he did not "pull the trigger."

Matter of B.D.C., 211 Mont. at 221, 687 P.2d at 657.

The jury was instructed correctly that they had to determine first that a deliberate homicide had occurred before they could reach a conviction of deliberate homicide by accountability. Gollehon's argument, therefore, that the death penalty is not a viable sentence for deliberate homicide by accountability is legally incorrect. Once determined responsible for deliberate homicide (acting alone) or for deliberate homicide by accountability (not acting alone) the death penalty is an appropriate sentence:

> A person convicted of the offense of deliberate homicide shall be punished by death . . ., by life imprisonment, or by imprisonment in the state prison for a term of not less than 10 years or more than 100 years, except as provided in 46-18-222.

Section 45-5-102(2), MCA.

Gollehon's and the dissent's argument concerning ambiguity in statutory instructions is not well made. Montana's accountability statutes are not ambiguous:

> When accountability exists. A person is legally accountable for the conduct of another when: . . . (3) either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense. (Emphasis added.)

35

Section 45-2-302(3), MCA. The statute is clear that an offense must be committed before accountability attaches the responsibility for the crime to the accused. There is no question here that Gerald Pileggi was beaten to death with baseball bats. Further, sufficient evidence was presented at trial to show that both Gollehon and Turner struck Pileggi repeatedly with baseball bats. There is also no question that the jury convicted Turner and Gollehon of committing a deliberate homicide together. The fact that the jury could not assess the fatal blow to either person swinging a bat cannot, even with minimal logic, be the cause of reducing responsibility for another's death to ten years as the dissent suggests.

We conclude that Gollehon's conviction of deliberate homicide by accountability means that 1) a deliberate homicide occurred and 2) Gollehon's actions before or during the commission of the homicide made him liable as a principal actor in that homicide. We further conclude that the death penalty is applicable to deliberate homicide by accountability.

We hold that the District Court did not err by sentencing Gollehon to death for the crime of deliberate homicide by accountability.

VIII

Did the District Court properly refuse to consider Gollehon's argument that death by hanging constitutes cruel and unusual punishment?

Gollehon argues that his death sentence is to be carried out by hanging which is cruel and unusual punishment in contravention

36

to the Eighth Amendment to the United States Constitution. The State argues that Gollehon was free to choose death by lethal injection and did not do so.

> The punishment of death must be inflicted by hanging the defendant by the neck until he is dead or, at the election of the defendant, by administration of a continuous, intravenous injection of a lethal quantity of an ultra-fast-acting barbiturate in combination with a chemical paralytic agent until a licensed physician pronounces that the defendant is dead according to accepted standards of medical practice. A defendant who wishes to choose execution by lethal injection shall do so at the hearing at which an execution date is set, and if he does not, the option to choose death by lethal injection is waived.

Section 46-19-103(3), MCA.

This Court has already settled the question raised by Gollehon. In State v. Langford (1992), 254 Mont. 44, 833 P.2d 1127 this Court stated:

> Section 46-19-103(3), MCA, provides Langford the opportunity to elect between lethal injection and hanging as a method of execution. Clearly, Langford had ample opportunity to elect lethal injection over hanging, but chose not to do so. Accordingly, he rendered moot any claim concerning the constitutionality of hanging as a method of execution.

Langford, 254 Mont. at 46-47, 833 P.2d at 1129.

Our examination of the transcript reveals that the court attempted to clarify Gollehon's options and that his attorney understood the consequences of silence as to choice:

> THE COURT: This is a continuation of cause DC-91-01, State of Montana versus William J. Gollehon. Mr. Gollehon, under Section 46-19-103, I am required to impose this sentence between 30 and 60 days, and likewise, that statute requires for you to make an election of whether you want to die by hanging or lethal injection. I will set sentencing for May 11th between the hours of 12:01 a.m. and 6:00 a.m. Do you have a preference for the method?

37

MR. DONAHOE: Your Honor, Mr. Gollehon with the respect to the election will stand mute, and I think that the statute requires that the finding be that he be hung. In that connection, Your Honor, I would bring to the Court's attention the fact that hanging may be unconstitutional as being cruel and unusual per se within the meaning of the 8th and 14th Amendment of the United States Constitution and under our own Montana Constitution. That issue in particular is being worked up I think through the Montana Courts right now and is now pending in the 9th Circuit Court of Appeals. I didn't bring it to the Court's attention before, obviously, because I didn't want to play my hand with regard to the sentence that the Court might be thinking about giving. In other words, I didn't want the Court to think that I thought that the death penalty was going to be imposed.

THE COURT: There is no problem there, Mr. Donahoe. What I want understood is that the election is to be exercised at this time by Mr. Gollehon, and if Mr. Gollehon does not request lethal injection, in that event that death by hanging survives any challenge to it, that he is, in essence, making an election to die by hanging. If that is understood, that is all. You are remanded to the custody of the Sheriff.

Sentencing hearing transcript March 16, 1992.

It is clear that both Gollehon and his counsel understood that if Gollehon chose not to speak in answer to the court's question concerning method of execution, he waived his right to election of methods. Having been given a choice and yet waiving the alternative of lethal injection, Gollehon's arguments concerning cruel and unusual punishment by hanging are moot and will not be considered further.

IX

Should this Court uphold Gollehon's death sentence on automatic review?

This Court is charged pursuant to § 46-18-310(3), MCA, with determining whether the death sentence imposed in any given case "is excessive or disproportionate to the penalty imposed in similar

38

cases, considering both the crime and the defendant." Section 46-18-310(3), MCA. Therefore, at Gollehon's request and pursuant to our responsibility we consider and compare all of the following cases, as we did in Turner, in which the death penalty was or could have been imposed:

> State v. Langford (1991), 248 Mont. 420, 813 P.2d 936; State v. Kills On Top (Vern) (1990), 243 Mont. 56, 793 P.2d 1273; State v. Kills On Top (Lester) (1990), 241 Mont. 378, 787 P.2d 336, cert denied, 111 S.Ct. 2910 (1991); State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352; cert. denied, 492 U.S. 910 (1989); State v. Keefe (1988), 232 Mont. 258, 759 P.2d 128; State v. Keith (1988), 231 Mont. 214, 754 P.2d 474; State v. Smith (1985), 217 Mont. 461, 705 P.2d 1087, cert. denied, 474 U.S. 1073, 106 S.Ct. 837, 88 L.Ed.2d 808 (1986), habeas corpus conditionally granted, 914 F.2d 1153 (9th Cir. 1990); State v. Fitzpatrick (1980), on remand, 186 Mont. 187, 606 P.2d 1343, cert. denied, 449 U.S. 891 (1980), reversed on other grounds, 869 F.2d 1247, (9th Cir.), cert. denied, 110 S.Ct. 349 (1989); State v. Coleman (1978), 185 Mont. 299, 605 P.2d 1000 (1979), cert. denied, 446 U.S. 970, (1980), reversed on other grounds, 874 F.2d 1280 (9th Cir. 1989), cert. denied, 110 S.Ct. 349, (1989); State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, vacated on other grounds, 433 U.S. 905 (1977), on remand, 177 Mont. 280, 581 P.2d 1205 (1978), vacated, 443 U.S. 903 (1979), on remand, 186 Mont. 481, 608 P.2d 428, cert. denied, 449 U.S. 1050 (1980), vacated in part on other grounds, 842 F.2d 1525 (9th Cir.), cert. denied, 488 U.S. 901 (1988).

We have examined the above cases with regard to the gravity of the offenses, the brutality with which they were committed and the existence of any factors meriting leniency.

We first note the heinous way in which Pileggi was killed. We also note that Gollehon was serving time for another deliberate homicide committed partially by the same brutal method.

Like the District Court, this Court acknowledges that the abuse Gollehon suffered as a child of unloving and brutal parents

39

cannot be divorced from Gollehon's current behavior. However, also like the District Court we note an extensive history of criminal conduct with no remorse or compassion attached to such conduct.

Gollehon seeks to have this Court consider the murders committed in the prison riot and the fact that none of the inmates involved were sentenced to death. While both cases involved inmates killing inmates, we will not consider the riot case because it is not before us. What is before us is a deliberately calculated killing of one human being by two others wielding baseball bats.

We have considered this case in comparison to the aforementioned cases involving murder by beating, by beating and strangulation, by strangulation and injection of unknown substance and by shooting, strangulation and stabbing. The facts of this case are no less heinous than the Kills On Top cases in which the victim was beaten with a tire iron and a rock, was shot and then had his throat slit. We stated in State v. Kills On Top (1990), 243 Mont. 56, 793 P.2d 1273, that "[t]he homicide was senseless, calculated and brutal." Kills On Top, 243 Mont. at 109, 793 P.2d at 1309. So too is the homicide before us.

When considering proportionality we consider directives also from the United States Supreme Court:

> In Enmund v. Florida (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, the court held that the death penalty may be imposed if defendant killed, attempted to kill, or intended to kill or that lethal force be used. This determination as to defendant's culpability need not be made by a jury, but may be made at any point in the state criminal process. Cabana v. Bullock (1986), 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704, overruled in

40

part on other grounds; Pope v. Illinois (1987), 481 U.S. 497, 504, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439, 447. See also Tison v. Arizona (1987), 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127.

> Applying the rule of Enmund and Cabana, the sentencing court made the determination that defendant killed the victim. We conclude that the findings and conclusions by the sentencing court are properly within the provisions of the statutes and that there is no contradiction present casting doubt on the validity of the death penalty. Under our statutory provisions, the sentencing judge is clearly given the responsibility and power to make this determination. (Emphasis added.)

State v. Kills on Top (1990), 241 Mont. at 404, 405, 787 P.2d at 353.

The evidence presented at trial reveals that Gollehon killed Pileggi in concert with Turner. Thus, we find that the Enmund rule is also satisfied.

Having considered the evidence, prior Montana cases and directives by the United States Supreme Court and the Ninth Circuit, we independently conclude that Gollehon killed Pileggi in concert with Turner and that the death penalty is appropriate.

We affirm the sentence of death imposed by the District Court. This case is remanded to the District Court for the determination of the date of execution in accordance with Montana statutes.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

41

_____

_____

_____
                  Justices

District Judge Ted O. Lympus
sitting for Justice R. C.
McDonough

Justice Karla M. Gray, dissenting.

I concur in the Court's opinion on issues 1 through 4 and 6. I dissent from the opinion on issues 5 and 7.

With regard to issue 5, it is my view that the statutory aggravating circumstances which the District Court found to exist do not exist in this case as a matter of law. This Court's conclusion to the contrary rests primarily on its statement that the jury did not find Gollehon not guilty of deliberate homicide, but only found that he did not act alone during the crime. The Court then quotes the legally correct instruction on accountability in seeming support of the application of the two aggravating circumstances at issue here. The Court is in error.

The Court's statement is incorrect and insupportable on the record before us. The record is clear that Gollehon was charged with, and acquitted of, deliberate homicide; he was charged in the alternative with accountability for deliberate homicide and convicted of that charge.

Nor does the quoted instruction support the Court's conclusion. The instruction properly directed the jury that, to convict Gollehon of accountability for deliberate homicide, it need only find that a deliberate homicide was committed and that either or both defendants "either before or during" the commission of the offense solicited, aided or abetted the other in the "planning or commission of the offense." Nothing in the instruction required the jury to find that Gollehon committed the offense of deliberate homicide.

43

To apply the aggravating circumstances at issue here required the District Court to make two determinations. First, the court had to find that the offense involved was deliberate homicide. There is no dispute about that fact. Second, however, the court had to find that the offense was committed by Gollehon. See § 46-18-303(1) and (2), MCA. Given Gollehon's acquittal on the deliberate homicide charge and the instruction requiring only that the defendant solicit, aid or abet before or during the commission of the offense regarding the planning or commission of the offense, it is my view that the District Court could not make the second determination required for application of the aggravating circumstances at issue. This Court has stated that "without the finding of a statutory aggravating circumstance, the death penalty is inappropriate." State v. Keith (1988), 231 Mont. 214, 240, 754 P.2d 474, 489. I conclude that the death penalty cannot be imposed here because no statutory aggravating circumstance exists.

In addressing issue 7, the Court concludes that the District Court did not err as a matter of law in imposing the death penalty on Gollehon. It reaches this conclusion by focusing primarily on the nature of "accountability," rather than on Montana's sentencing statutes. The Court relies on Illinois cases interpreting the "parent" of our accountability statute; the Court does not, however, examine whether Montana's sentencing statutes are adopted from Illinois or even whether they are similar to those in effect in Illinois so as to legitimize the use of the Stanciel and Ruiz cases in resolving this important issue which is truly a matter of life and death. For those reasons, and because it is my view that

44

an appropriate analysis of Montana's sentencing statutes precludes application of the death penalty to Gollehon's conviction for accountability for deliberate homicide, I dissent.

The death penalty may be imposed in Montana only under the limited circumstances provided by statute. Specifically, that sentence is available for the offenses defined in §§ 45-5-102(a) and (b), 45-5-303, and 46-18-220, MCA. Only § 45-5-102, MCA, is relevant here.

Section 45-5-102, MCA, describes when a person has committed deliberate homicide. Such an offense is committed when a person "purposely or knowingly causes the death of another human being." Section 45-5-102(1)(a), MCA. Gollehon was charged with, and specifically found not guilty of, this offense. Pursuant to § 45-5-102(1)(b), MCA, the offense of deliberate homicide for which the death penalty is available also includes the crime commonly referred to as "felony murder." This offense is not at issue here. Thus, the death penalty available for these offenses pursuant to § 45-5-102(2), MCA, is not available here.

Moreover, with regard to § 45-5-102, MCA, the statute makes it clear that the legislature is aware of how to include what we might call "offshoot" homicides--such as felony murder--in the definition of the offense of deliberate homicide for which the death penalty is available. The legislature specifically included felony murder; it did not include accountability for deliberate homicide.

Other statutes also must be scrutinized to determine the applicability of the death penalty in this case. Section 45-2-302, MCA, describes when a person is legally accountable for the conduct

45

of another. It is this accountability for deliberate homicide of which Gollehon was convicted. That statute does not include any sentencing provision. Other statutes addressing indirect offenses, such as "conspiracy" and "attempt," do contain sentencing provisions. Those statutes, §§ 45-4-102(3) and 45-4-103(3), MCA, essentially provide for the same sentence as the underlying offense. Again, it is clear that the legislature knows how to include sentencing cross-references when it desires and intends to do so. It did not do so with regard to accountability.

The Montana legislature has provided a "fall back" sentence to cover convictions for which it does not specify a penalty. Section 46-18-213, MCA, mandates that when no penalty is otherwise provided for a felony, the sentencing court may sentence for any term not to exceed 10 years in the state prison, a fine not to exceed $50,000, or both. I conclude that this statutory penalty applies to Gollehon's conviction.

The Court suggests that it is I, through my reasoning, who would allow the perpetrator of a heinous crime to be sentenced to a maximum of ten years' imprisonment. This is not so. The fact is that it is the legislature's job--not mine or this Court's--to determine appropriate sentences for criminal offenders. The legislature has not clearly provided for the imposition of the death penalty under these circumstances. If its failure to do so is an unintended result of legislative oversight, the legislature can, and should, correct it. Absent such an action, a proper interpretation of the legislature's intent as reflected in present sentencing statutes is that the death penalty is not available

46

here.

It is my view that the Court's conclusion on this issue violates the most fundamental canons of both judicial function and statutory interpretation. It has not interpreted the statutes at issue here in accordance with their plain meaning. Rather, it has inserted into the statutes a criminal sentence--the most severe and final sentence of all--not provided for by the Montana legislature, in direction contravention of § 1-2-101, MCA. I cannot agree.

The Court's approach also represents a radical departure from the rule of lenity which has been embraced by this Court in interpreting penal statutes and from its own controlling, and recent, precedent. In State v. Goodwin (1991), 249 Mont. 1, 813 P.2d 953, and State v. Van Robinson (1991), 248 Mont. 528, 813 P.2d 967, we affirmed our commitment to the following "classic rule of construction of criminal statutes" in construing sentencing statutes:

> Penal statutes are construed with such strictness as to safeguard the rights of the defendant. . . . [P]enal statutes are not to be extended in their operation to persons, things, or acts not within their descriptive terms, or the fair and clear import of the language used. Nothing can be read into penal statutes by implication.

Goodwin, 813 P.2d at 966 (citation omitted). See also Van Robinson, 813 P.2d at 971, quoting Goodwin. I submit that the Court's analysis on this issue violates this classic rule by extending the death penalty to a person and acts not within either the terms or the fair and clear import of the language used by the Montana legislature. The death penalty will be imposed on Gollehon by implication.

This Court also has agreed--until now--with the following

47

United States Supreme Court articulation of the rule of lenity:

> First, as we have recently reaffirmed, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." In various ways over the years, we have stated that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." This principle is founded on two policies that have long been part of our tradition. First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. . . ." Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should defined criminal activity. This policy embodies "the instinctive distaste against men languishing in prison unless the law-maker has clearly said they should." Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.

Goodwin, 813 P.2d at 967 (citations omitted). This classic and governing rule is applicable here and mandates a conclusion that the death penalty cannot be imposed on Gollehon. Yet, the Court totally ignores even the existence of the rule of lenity in analyzing the availability of the death penalty in this case. The Court's confusing references to Goodwin in the companion case of State v. Turner certainly provide no help in fostering clarity in this regard. We are left to wonder whether this case signals the death knell of the rule of lenity in Montana or, alternatively, whether the Court intends to continue to embrace that rule only where the underlying facts are less brutal and horrifying than those encompassing the death of inmate Pileggi.

I feel no sympathy for Gollehon. Indeed, the brutality of the acts upon which his conviction is based is surely beyond the understanding and even the imagination of every decent and rational

48

human being.   The fact remains, however, that the Montana legislature has not provided for application of the death penalty here.   I cannot allow my horror over the circumstances of this crime to override my view of the result necessary here as a matter of law.   I would remand this case to the District Court for resentencing.

_____
Justice

Justice Terry N. Trieweiler and Justice William E. Hunt, Sr., join in the foregoing dissent of Justice Karla M. Gray.

_____
Justice

_____
Justice

49

October 20, 1993

CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


MICHAEL DONAHOE
Attorney at Law
46 N. Last Chance Gulch
Helena, MT   59601

Hon. Joseph P. Mazurek, Attorney General
Jennifer Anders, Assistant
Justice Bldg.
Helena, MT   59620

Christopher G. Miller
Powell County Attorney
Powell County Courthouse
Deer Lodge, MT   59722

John P. Connor, Assistant Attorney General
and Special Deputy Powell County Attorney
215 N. Sanders, Justice Building
Helena, MT   59620

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy